# LAKE SHORE & MICHIGAN SOUTHERN RAILWAY COMPANY *v.* OHIO.

ERROR TO THE SUPREME COURT OF THE STATE OF OHIO.

No. 95.   Argued December 18, 1898. — Decided February 20, 1899.

The statute of Ohio relating to railroad companies, in that State which provides that "Each company shall cause three, each way, of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at a station, city or village, containing over three thousand in-

habitants, for a time sufficient to receive and let off passengers; if a company, or any agent or employé thereof, violate, or cause or permit to be violated, this provision, such company, agent or employé shall be liable to a forfeiture of not more than one hundred nor less than twenty-five dollars, to be recovered in an action in the name of the State, upon the complaint of any person, before a justice of the peace of the county in which the violation occurs, for the benefit of the general fund of the county; and in all cases in which a forfeiture occurs under the provisions of this section, the company whose agent or employé caused or permitted such violation shall be liable for the amount of the forfeiture, and the conductor in charge of such train shall be held, *prima facie,* to have caused the violation," is not, in the absence of legislation by Congress on the subject, repugnant to the Constitution of the United States, when applied to interstate trains, carrying interstate commerce through the State of Ohio on the Lake Shore and Michigan Southern Railway.

THE case is stated in the opinion.

*Mr. George C. Greene* for plaintiff in error.

*Mr. W. H. Polhamus* for defendant in error.

MR. JUSTICE HARLAN delivered the opinion of the court.

This action was commenced before a justice of the peace of the county of Cuyahoga, Ohio, to recover the penalty prescribed by section 3320 of the Revised Statutes of that State.

That section is a part of a chapter relating to railroad companies, and, as amended by the act of April 13, 1889, provides:

"Each company shall cause three, each way, of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at a station, city or village, containing over three thousand inhabitants, for a time sufficient to receive and let off passengers; if a company, or any agent or employé thereof, violate, or cause or permit to be violated, this provision, such company, agent or employé shall be liable to a forfeiture of not more than one hundred nor less than twenty-five dollars, to be recovered in an action in the name of the State, upon the complaint of any person, before a justice of the peace of the county in which the violation occurs, for the benefit of the general fund of the county; and in all cases in which a forfeiture occurs under the provisions of this section,

the company whose agent or employé caused or permitted such violation shall be liable for the amount of the forfeiture, and the conductor in charge of such train shall be held, *prima facie*, to have caused the violation." Laws of Ohio, 1889, vol. 86, p. 291; Rev. Stat. Ohio, 1890, § 3320.

The case was removed for trial into the court of common pleas of Cuyahoga County in which a judgment was rendered against the railroad company for the sum of one hundred dollars. Upon writ of error to the Circuit Court of that county the judgment was affirmed, and the judgment of the latter court was affirmed by the Supreme Court of Ohio.

The facts upon which the case was determined in the state court were as follows:

The plaintiff Lawrence is a resident of West Cleveland, a municipal corporation of Ohio having more than three thousand inhabitants.

The defendant railway company is a corporation organized under the respective laws of Ohio, New York, Pennsylvania, Indiana, Michigan and Illinois, and owns and operates a railroad located partly within the village of West Cleveland. Its line extends from Chicago through those States to Buffalo.

On the 9th day of October, 1890, as well as for some time prior thereto and thereafter, the company caused to run daily both ways over its road within the limits of West Cleveland three or more regular trains carrying passengers. And on that day (which was not Sunday) it did not stop or cause to be stopped within that village more than one of such trains each way long enough to receive or let off passengers.

On the day above named and after that date the company was engaged in carrying both passengers and freight over its railroad from Chicago and other stations in Indiana and Michigan through each of said several States to and into New York, Pennsylvania and Ohio and to Buffalo, and from Buffalo through said States to Chicago. It did not on that day nor shortly prior thereto nor up to the commencement of the present suit, run daily both ways or either way over said road through the village of West Cleveland, three regular trains nor more than one regular train each way carrying passengers " which were

not engaged in interstate commerce, or that did not have upon them passengers who had paid through fare, and were entitled to ride in said trains going in the one direction from the city of Chicago to the city of Buffalo, through the States of Indiana, Ohio and Pennsylvania, and those going the other direction from the city of Buffalo . . . through said States to the city of Chicago."

On or about the day named the company operated but one regular train carrying passengers each way that was not engaged in carrying such through passengers, and that train did stop at West Cleveland on that day for a time sufficient to receive and let off passengers.

The through trains that passed westwardly through West Cleveland on the 9th day of October, 1890, were a limited express train having two baggage and express cars, one passenger coach and three sleepers, from New York to Chicago; a fast mail train having five mail cars, one passenger coach and one sleeper from New York to Chicago; and a train having one mail car, two baggage and express cars, four passenger coaches and one sleeper from Cleveland to Chicago. The trains running eastwardly on the same day through West Cleveland were a limited express train having one baggage and express car and three sleepers from Chicago to New York; a train having one baggage and express car, three passenger coaches and two sleepers from Chicago to New York; a train having one mail car, two baggage and express cars and seven passenger coaches from Chicago to Buffalo; and a train having three mail cars and one sleeper from Chicago to New York.

The average time required to stop a train of cars and receive and let off passengers is three minutes.

The number of villages in Ohio containing three thousand inhabitants through which the above trains passed on the day named was thirteen.

The trial court found as a conclusion of law that within the meaning of the Constitution of the United States the statute of Ohio was not a regulation of commerce among the States and was valid until Congress acted upon the subject. This gen-

eral view was affirmed by the circuit court of Cuyahoga
County and by the Supreme Court of Ohio.

The plaintiff in error contends that as the power to regu-
late interstate commerce is vested in Congress the statute of
Ohio in its application to trains engaged in such commerce
is directly repugnant to the Constitution of the United States.

In support of this contention it insists that an interstate
railroad carrier has the right to start its train at any point in
one State and pass into and through another State without
taking up or setting down passengers within the limits of the
latter State. As applied to the present case, that contention
means that the defendant company, although an Ohio corpora-
tion deriving all its franchises and privileges from that State,
may, if it so wills, deprive the people along its line in Ohio of
the benefits of interstate communication by its railroad; in
short, that the company if it saw fit to do so could, beyond
the power of Ohio to prevent it, refuse to stop within that
State trains that started from points beyond its limits, or even
trains starting in Ohio destined to places in other States.

In the argument at the bar as well as in the printed brief
of counsel, reference was made to the numerous cases in this
court adjudging that what are called the police powers of the
States were not surrendered to the General Government when
the Constitution was ordained but remained with the several
States of the Union. And it was asserted with much confi-
dence that while regulations adopted by competent local au-
thority in order to protect or promote the public health, the
public morals or the public safety have been sustained where
such regulations only incidentally affected commerce among
the States, the principles announced in former adjudications
condemn as repugnant to the Constitution of the United States
all local regulations that affect interstate commerce in any
degree if established merely to subserve the *public conven-
ience.*

One of the cases cited in support of this position is *Hen-
nington* v. *Georgia*, 163 U. S. 299, 303, 308, 317, which in-
volved the validity of a statute of Georgia providing that
"if any freight train shall be run on any railroad in this

State on the Sabbath Day (known as Sunday), the superintendent of such railroad company, or the officer having charge of the business of that department of the railroad, shall be liable for indictment for a misdemeanor in each county through which such trains shall pass, and on conviction shall be punished. . . . *Provided, always,* That whenever any train on any railroad in this State, having in such train one or more cars loaded with live stock, which train shall be delayed beyond schedule time, shall not be required to lay over on the line of road or route during Sunday, but may run on to the point where, by due course of shipment or consignment, the next stock pen on the route may be, where said animals may be fed and watered, according to the facilities usually afforded for such transportation. And it shall be lawful for the freight trains on the different railroads in this State running over said roads on Saturday night, to run through to destination : *Provided,* The time of arrival, according to the schedule by which the train or trains started on the trip, shall not be later than eight o'clock on Sunday morning." This court said : "The well-settled rule is, that if a statute purporting to have been enacted to protect the public health, the public morals or the public safety has no real or substantial relation to those objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of courts to so adjudge, and thereby give effect to the Constitution."

The contention in that case was that the running of railroad cars laden with interstate freight was committed exclusively to the control and supervision of the National Government; and that although Congress had not taken any affirmative action upon the subject, state legislation interrupting interstate commerce even for a limited time only, whatever might be its object and however essential such legislation might be for the comfort, peace or safety of the people of the State, was a regulation of interstate commerce forbidden by the Constitution of the United States.

After observing that the argument in behalf of the defendant rested upon the erroneous assumption that the statute of Georgia was such a regulation of interstate commerce as was

forbidden by the Constitution without reference to affirmative action by Congress, and not merely a statute enacted by the State under its police power, and which, although in some degree affecting interstate commerce, did not go beyond the necessities of the case, and therefore was valid, at least until Congress intervened, this court, upon a review of the adjudged cases, said : "These authorities make it clear that the legislative enactments of the States, passed under their admitted police powers, and having a real relation to the domestic peace, order, health and safety of their people, but which, by their necessary operation, affect to some extent or for a limited time the conduct of commerce among the States, are yet not invalid by force alone of the grant of power to Congress to regulate such commerce; and, if not obnoxious to some other constitutional provision or destructive of some right secured by the fundamental law, are to be respected in the courts of the Union until they are superseded and displaced by some act of Congress passed in execution of the power granted to it by the Constitution. Local laws of the character mentioned have their source in the powers which the States reserved and never surrendered to Congress, of providing for the public health, the public morals and the public safety, and are not, within the meaning of the Constitution, and considered in their own nature, regulations of interstate commerce simply because, for a limited time or to a limited extent, they cover the field occupied by those engaged in such commerce. The statute of Georgia is not directed against interstate commerce. It establishes a rule of civil conduct applicable alike to all freight trains, domestic as well as interstate. It applies to the transportation of interstate freight the same rule precisely that it applies to the transportation of domestic freight." Again.: "We are of opinion that such a law, although in a limited degree affecting interstate commerce, is not for that reason a needless intrusion upon the domain of Federal jurisdiction, nor strictly a regulation of interstate commerce, but, considered in its own nature, is an ordinary police regulation designed to secure the well-being and to promote the general welfare of the people within the

State by which it was established, and therefore not invalid by force alone of the Constitution of the United States."

It is insisted by counsel that these and observations to the same effect in different cases show that the police powers of the States, when exerted with reference to matters more or less connected with interstate commerce, are restricted in their exercise, so far as the National Constitution is concerned, to regulations pertaining to the health, morals or safety of the public, and do not embrace regulations designed merely to promote the *public convenience.*

This is an erroneous view of the adjudications of this court. While cases to which counsel refer involved the validity of state laws having reference directly to the public health, the public morals or the public safety, in no one of them was there any occasion to determine whether the police powers of the States extended to regulations incidentally affecting interstate commerce but which were designed only to promote the public convenience or the general welfare. There are however numerous decisions by this court to the effect that the States may legislate with reference simply to the public convenience, subject of course to the condition that such legislation be not inconsistent with the National Constitution, nor with any act of Congress passed in pursuance of that instrument, nor in derogation of any right granted or secured by it. As the question now presented is one of great importance, it will be well to refer to some cases of the latter class.

In *Gilman* v. *Philadelphia*, 3 Wall. 713, 729, which involved the validity of a state enactment authorizing the construction of a permanent bridge over the Schuylkill River within the limits of Philadelphia, and which bridge in fact interfered with the use of the river by vessels of a certain size which had been long accustomed to navigate it, the court said : " It must not be forgotten that bridges, which are connecting parts of turnpikes, streets and railroads, are means of commercial transportation, as well as navigable waters, and that the commerce which passes over a bridge may be much greater than would ever be transported on the water it ob-

structs. *It is for the municipal power to weigh the considerations which belong to the subject, and to decide which shall be preferred, and how far either shall be made subservient to the other.* The States have always exercised this power, and from the nature and objects of the two systems of government they must always continue to exercise it, subject, however, in all cases, to the paramount authority of Congress, whenever the power of the States shall be exerted within the sphere of the commercial power which belongs to the nation."

So, in *Pound* v. *Turck*, 95 U. S. 459, 464, which was a case where obstructions — piers and booms — had been placed under the authority of the State of Wisconsin in the Chippewa River, one of the navigable waters of the United States, it was said : " There are within the State of Wisconsin, and perhaps other States, many small streams navigable for a short distance from their mouths in one of the great rivers of the country, by steamboats, but whose greatest value in water carriage is as outlets to saw-logs, sawed lumber, coal, salt, etc. In order to develop their greatest utility in that regard, it is often essential that such structures as dams, booms, piers, etc., should be used, which are substantial obstructions to general navigation, and more or less so to rafts and barges. But to the legislature of the State may be most appropriately confided the authority to authorize these structures where their use will do more good than harm, and to impose such regulations and limitations in their construction and use *as will best reconcile and accommodate the interest of all concerned in the matter.* And since the doctrine we have deduced from the cases recognizes the right of Congress to interfere and control the matter whenever it may deem it necessary to do so, the exercise of this limited power may all the more safely be confided to the local legislatures."

The same principles were announced in *Escanaba Company* v. *Chicago*, 107 U. S. 678, 683. That case involved the validity of a certain local ordinance regulating the opening and closing of bridges over the Chicago River within the limits of the city of Chicago. That ordinance required the bridges to be closed at certain hours of the day, so as not to obstruct the passage over them of vast numbers of operatives and other

people going to and from their respective places of business. It was conceded that by the closing of the bridges at those hours vessels were obstructed in their use of the river. This court in that case said: "The Chicago River and its branches must, therefore, be deemed navigable waters of the United States, over which Congress under its commercial power may exercise control to the extent necessary to protect, preserve and improve their free navigation. But the States have full power to regulate within their limits matters of internal police, including in that general designation whatever will promote the peace, comfort, *convenience and prosperity of their people* This power embraces the construction of roads, canals and bridges, and the establishment of ferries, and it can generally be exercised more wisely by the States than by a distant authority. They are the first to see the importance of such means of internal communication, and are more deeply concerned than others in their wise management. Illinois is more immediately affected by the bridges over the Chicago River and its branches than any other State, and is more directly concerned for the prosperity of the city of Chicago, *for the convenience and comfort of its inhabitants, and the growth of its commerce.* And nowhere could the power to control the bridges in that city, their construction, form and strength, and the size of their draws, and the manner and times of using them, be better vested than with the State, or the authorities of the city upon whom it has devolved that duty. When its power is exercised so as to unnecessarily obstruct the navigation of the river or its branches, Congress may interfere and remove the obstruction. If the power of the State and that of the Federal government come in conflict, the latter must control and the former yield. This necessarily follows from the position given by the Constitution to legislation in pursuance of it, as the supreme law of the land. But until Congress acts on the subject the power of the State over bridges across its navigable streams is plenary." It was consequently adjudged that the city ordinance was not to be deemed such a regulation of interstate commerce as, in the absence of national legislation, should be deemed invalid.

In *Cardwell* v. *American Bridge Company*, 113 U. S. 205, 208, it was held ·that a statute of California authorizing a bridge *without a draw or opening for the passage of vessels* to be constructed over a navigable water ·of the United States within that State was not — in the absence of legislation by Congress — to be deemed repugnant to the commerce clause of the Constitution. The court, referring to prior cases, said : " In these cases the control of Congress over navigable waters within the States so as to preserve their free navigation under the commercial clause of the Constitution, the power of the States within which they lie to authorize the construction of bridges over them until Congress intervenes and supersedes their authority, and the right of private parties to interfere with their construction or continuance, have been fully considered, and we are entirely satisfied with the soundness of the conclusions reached. They recognize the full power of the States to regulate within their limits matters of internal police, which embraces among other things the construction, repair and maintenance of roads and bridges, and the establishment of ferries; that the States are more likely to. appreciate the importance of these means of internal communication and to provide for their proper management, than a government at a distance; and that, as to bridges over navigable streams, their power is subordinate to that of Congress, as an act of the latter body is, by the Constitution, made the supreme law of the land; but that until Congress acts on the subject their power is plenary. When Congress acts directly with reference to the bridges authorized by the State, its will must control so far as may be necessary to secure the free navigation of the streams." The doctrines of this case were reaffirmed in *Huse* v. *Glover*, 119 U. S. 543.

In *Western Union Telegraph Co.* v. *James*, 162 U. S. 650, 662, the question was presented whether a state enactment requiring telegraph companies with lines of wires wholly or partly within the State to receive telegrams and on payment of the charges thereon to deliver them with due diligence, was not a regulation of interstate commerce when applied to interstate telegrams. We held that such enactments did not in any

just sense regulate interstate commerce. It was said in that case: "While it is vitally important that commerce between the States should be unembarrassed by vexatious state regulations regarding it, yet on the other hand there are many occasions where the police power of the State can be properly exercised to insure a faithful and prompt performance of duty within the limits of the State upon the part of those who are engaged in interstate commerce. We think the statute in question is one of that class, and in the absence of any legislation by Congress, the statute is a valid exercise of the power of the State over the subject."

So, in *Richmond & Alleghany Railroad* v. *Patterson Tobacco Co.*, 169 U. S. 311, 315, it was adjudged that a statute of Virginia defining the obligations of carriers who accepted for transportation anything directed to points of destination beyond the termini of their own lines or routes, was not, in its application to interstate business, a regulation of interstate commerce within the meaning of the Constitution. This court said: "Of course, in a latitudinarian sense any restriction as to the evidence of a contract, relating to interstate commerce, may be said to be a limitation on the contract itself. But this remote effect, resulting from the lawful exercise by a State of its power to determine the form in which contracts may be proven, does not amount to a regulation of interstate commerce." And the court cited in support of its conclusion the case of *Chicago, Milwaukee &c. Railway* v. *Solan*, 169 U. S. 133, 137, which involved the validity of state regulations as to the liability of carriers of passengers, and in which it was said: "They are not in themselves regulations of interstate commerce, although they control in some degree the conduct and liability of those engaged in such commerce. So long as Congress has not legislated upon the particular subject, they are rather to be regarded as legislation in aid of such commerce, and as a rightful exercise of the police power of the State to regulate the relative rights and duties of all persons and corporations within its limits."

Now, it is evident that these cases had no reference to the health, morals or safety of the people of the State, but only

to the public convenience. They recognized the fundamental principle that outside of the field directly occupied by the General Government under the powers granted to it by the Constitution, all questions arising within a State that relate to its internal order, or that involve the public convenience or the general good, are primarily for the determination of the State, and that its legislative enactments relating to those subjects, and which, are not inconsistent with the state constitution, are to be respected and enforced in the courts of the Union if they do not by their operation directly entrench upon the authority of the United States or violate some right protected by the National Constitution. The power here referred to is,— to use the words of Chief Justice Shaw — the power "to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the Constitution, as they shall judge to be for the good and welfare of the Commonwealth and of the subjects of the same." *Commonwealth* v. *Alger,* 7 Cushing, 53, 85. Mr. Cooley well said: "It cannot be doubted that there is ample power in the legislative department of the State to adopt all necessary legislation for the purpose of enforcing the obligations of railway companies as carriers of persons and goods to accommodate the public impartially, and to make every reasonable provision for carrying with safety and expedition." Cooley's Const. Lim. (6th ed.) p. 715. It may be that such legislation is not within the "police power" of a State, as those words have been sometimes, although inaccurately, used. But in our opinion the power, whether called police, governmental or legislative, exists in each State, by appropriate enactments not forbidden by its own constitution or by the Constitution of the United States, to regulate the relative rights and duties of all persons and corporations within its jurisdiction, and therefore to provide for the public convenience and the public good. This power in the States is entirely distinct from any power granted to the General Government, although when exercised it may sometimes reach subjects over which national legislation can be constitutionally extended. When Congress acts with ref-

erénce to a matter confided to it by the Constitution, then its statutes displace all conflicting local regulations touching that matter, although such regulations may have been established in pursuance of a power not surrendered by the States to the General Government. *Gibbons* v. *Ogden,* 9 Wheat. 1, 210; *Sinnot* v. *Davenport,* 22 How. 227, 243; *Missouri, Kansas & Texas Railway* v. *Haber,* 169 U. S. 613, 626.

It is not contended that the statute in question is repugnant to the Constitution of the United States when applied to railroad trains carrying passengers between points within the State of Ohio. But the contention is that to require railroad companies, even those organized under the laws of Ohio, to stop their trains or any of them carrying interstate passengers at a particular place or places in the State for a reasonable time, so directly affects commerce among the States as to bring the statute, whether Congress has acted or not on the same subject, into conflict with the grant in the Constitution of power to regulate such commerce. That such a regulation may be in itself reasonable and may promote the public convenience or subserve the general welfare is, according to the argument made before us, of no consequence whatever; for, it is said, a state regulation which *to any extent* or for a limited time only interrupts the absolute, continuous freedom of interstate commerce is forbidden by the Constitution, although Congress has not legislated upon the particular subject covered by the state enactment. If these broad propositions are approved, it will be difficult to sustain the numerous judgments of this court upholding local regulations which in some degree or only incidentally affected commerce among the States, but which were adjudged not to be in themselves regulations of interstate commerce, but within the police powers of the States and to be respected so long as Congress did not itself cover the subject by legislation. *Cooley* v. *Philadelphia,* 12 How. 299, 320; *Sherlock* v. *Alling,* 93 U. S. 99, 104; *Morgan* v. *Louisiana,* 118 U. S. 455, 463; *Smith* v. *Alabama,* 124 U. S. 465; *Nashville, Chattanooga &c. Railway* v. *Alabama,* 128 U. S. 96, 100; *Hennington* v. *Georgia,* above cited; *Missouri, Kansas and Texas Railway* v. *Haber,* above cited; and *N. Y.,*

*N. H. & Hartford Railroad* v. *New York*, 165 U. S. 628, 631, 632, were all cases involving state regulations more or less affecting interstate or foreign commerce, but which were sustained upon the ground that they were not directed against nor were direct burdens upon interstate or foreign commerce; and having been enacted only to protect the public safety, the public health or the public morals, and having a real, substantial relation to the public ends intended to be accomplished thereby, were not to be deemed absolutely forbidden because of the mere grant of power to Congress to regulate interstate and foreign commerce, but to be regarded as only incidentally affecting such commerce and valid until superseded by legislation of Congress on the same subject.

In the case last cited — *N. Y., N. H. & Hartford Railroad* v. *New York* — the question was as to the validity, when applied to interstate railroad trains, of a statute of New York forbidding the heating of passenger cars in a particular mode. This court said: "According to numerous decisions of this court sustaining the validity of state regulations enacted under the police powers of the State, and which incidentally affected commerce among the States and with foreign nations, it was clearly competent for the State of New York, in the absence of national legislation covering the subject, to forbid under penalties the heating of passengers cars in that State by stoves or furnaces kept inside the cars or suspended therefrom, although such cars may be employed in interstate commerce. While the laws of the States must yield to acts of Congress passed in execution of the powers conferred upon it by the Constitution, *Gibbons* v. *Ogden*, 9 Wheat. 1, 211, the mere grant to Congress of the power to regulate commerce with foreign nations and among the States did not, of itself and without legislation by Congress, impair the authority of the States to establish such reasonable regulations as were appropriate for the protection of the health, the lives and the safety of their people. The statute in question had for its object to protect all persons travelling in the State of New York on passenger cars moved by the agency of steam against the perils attending a particular mode of heating such cars.

. . . The statute in question is not directed against interstate commerce. Nor is it within the necessary meaning of the Constitution a regulation of commerce, although it controls, in some degree, the conduct of those engaged in such commerce. So far as it may affect interstate commerce, it is to be regarded as legislation in aid of commerce and enacted under the power remaining with the State to regulate the relative rights and duties of all persons and corporations within its limits. Until displaced by such national legislation as Congress may rightfully establish under its power to regulate commerce with foreign nations and among the several States, the validity of the statute, so far as the commerce clause of the Constitution of the United States is concerned, cannot be questioned."

Consistently with these doctrines it cannot be adjudged that the Ohio statute is unconstitutional. The power of the State by appropriate legislation to provide for the public convenience stands upon the same ground precisely as its power by appropriate legislation to protect the public health, the public morals or the public safety. Whether legislation of either kind is inconsistent with any power granted to the General Government is to be determined by the same rules.

In what has been said we have assumed that the statute is not in itself unreasonable; that is, it has appropriate relation to the public convenience, does not go beyond the necessities of the case, and is not directed against interstate commerce. In *Railroad Co.* v. *Husen*, 95 U. S. 465, 473, reference was made to some decisions of state courts in relation to statutes prohibiting the introduction into a State of cattle having infectious diseases, and in which it was contended that it was for the legislature and not for the courts to determine whether such legislation went beyond the danger to be apprehended and was therefore something more than the exertion of the police power. This court said that it could not concur in that view; that as the police power of a State cannot obstruct either foreign or interstate commerce "beyond the necessity for its exercise," it was the duty of the courts to guard vigilantly against "needless intrusion" upon the field

committed by the Constitution to Congress.  As the cases above cited show, and as appears from other cases, the reasonableness or unreasonableness of a state enactment is always an element in the general inquiry by the court whether such legislation encroaches upon national authority, or is to be deemed a legitimate exertion of the power of the State to protect the public interests or promote the public convenience.

In our judgment the assumption that the statute of Ohio was not directed against interstate commerce but is a reasonable provision for the public convenience, is not unwarranted. The requirement that a railroad company whose road is operated within the State shall cause three each way of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at any station, city or village of three thousand inhabitants for a time sufficient to receive and let off passengers, so far from being unreasonable, will greatly subserve the public convenience.  The statute does not stand in the way of the railroad company running as many trains as it may choose between Chicago and Buffalo without stopping at intermediate points, or only at very large cities on the route, if in the contingency named in the statute the required number of trains stop at each place containing three thousand inhabitants long enough to receive and let off passengers.  It seems from the evidence that the average time required to stop a train and receive and let off passengers is only three minutes.  Certainly, the State of Ohio did not endow the plaintiff in error with the rights of a corporation for the purpose simply of subserving the convenience of passengers travelling through the State between points outside of its territory. "The question is no longer an open one," this court said in *Cherokee Nation* v. *Southern Kansas Railway*, 135 U. S. 641, 657, "as to whether a railroad is a public highway, established primarily for the convenience of the people, and to subserve public ends, and, therefore, subject to governmental control and regulation.  It is because it is a public highway, and subject to such control, that the corporation by which it is constructed, and by which it is to be maintained, may be permitted, under legislative sanction, to appropriate property

for the purpose of a right of way, upon making just compensation to the owner, in the mode prescribed by law." In the construction and maintenance of such a highway under public sanction the corporation really performs a function of the State. *Smyth* v. *Ames*, 169 U. S. 466, 544. The plaintiff in error accepted its charter subject necessarily to the condition that it would conform to such reasonable regulations as the State might from time to time establish that were not in violation of the supreme law of the land. In the absence of legislation by Congress, it would be going very far to hold that such an enactment as the one before us was in itself a regulation of interstate commerce. It was for the State to take into consideration all the circumstances affecting passenger travel within its limits, and as far as practicable make such regulations as were just to all who might pass over the road in question. It was entitled of course to provide for the convenience of persons desiring to travel from one point to another in the State on domestic trains. But it was not bound to ignore the convenience of those who desired to travel from places in the State to places beyond its limits, or the convenience of those outside of the State who wished to come into it. Its statute is in aid of interstate commerce of that character. It was not compelled to look only to the convenience of those who desired to pass through the State without stopping. Any other view of the relations between the State and the corporation created by it would mean that the directors of the corporation could manage its affairs solely with reference to the interests of stockholders and without taking into consideration the interests of the general public. It would mean not only that such directors were the exclusive judges of the manner in which the corporation should discharge the duties imposed upon it in the interest of the public, but that the corporation could so regulate the running of its interstate trains as to build up cities and towns at the ends of its line or at favored points, and by that means destroy or retard the growth and prosperity of those at intervening points. It would mean also that beyond the power of the State to prevent it the defendant railway company could run all its trains

through the State without stopping at any city within its limits however numerous its population, and could prevent the people along its road within the State who desired to go beyond its limits from using its interstate trains at all, or only at such points as the company chose to designate. A principle that in its application admits of such results cannot be sanctioned.

We perceive in the legislation of Ohio no basis for the contention that the State has invaded the domain of national authority or impaired any right secured by the National Constitution. In the recent case of *Jones* v. *Brim*, 165 U. S. 180, 182, it was adjudged that, embraced within the police powers of a State was the establishment, maintenance and control of public highways, and that under such powers reasonable regulations incident to the right to establish and maintain such highways could be established by the State. And the State of Ohio by the statute in question has done nothing more than to so regulate the use of a public highway established and maintained under its authority as will reasonably promote the public convenience. It has not unreasonably obstructed the freedom of commerce among the States. Its regulations apply equally to domestic and interstate railroads. Its statute is not directed against interstate commerce, but only incidentally affects it. It has only forbidden one of its own corporations from discriminating unjustly against a large part of the public, for whose convenience that corporation was created and invested with authority to maintain a public highway within the limits of the State.

It has been suggested that the conclusion reached by us is not in accord with *Hall* v. *De Cuir*, 95 U. S. 485, 488; *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 556, and *Illinois Central Railroad Company* v. *Illinois*, 163 U. S. 142, 153, 154, in each of which cases certain state enactments were adjudged to be inconsistent with the grant of power to Congress to regulate commerce among the States.

In *Hall* v. *De Cuir* a statute of Louisiana relating to carriers of passengers within that State, and which prohibited any discrimination against passengers on account of race or color, was

held — looking at its necessary operation — to be a regulation of and a direct burden on commerce among the States, and therefore unconstitutional. The defendant, who was sued for damages on account of an alleged violation of that statute, was the master and owner of a steamboat enrolled and licensed under the laws of the United States for the coasting trade, and plying as a regular packet for the transportation of freight and passengers between New Orleans, Louisiana, and Vicksburg, Mississippi, touching at the intermediate landings both within and without Louisiana as occasion required. He insisted that it was void as to him because it directly regulated or burdened interstate business. The court distinctly recognized the principle upon which we proceed in the present case, that state legislation relating to commerce is not to be deemed a regulation of interstate commerce simply because it may to some extent or under some circumstances affect such commerce. But, speaking by Chief Justice Waite, it said: "We think it may be safely said that state legislation which seeks to impose a *direct* burden upon interstate commerce, or to interfere *directly* with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without, or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage. His disposition of passengers taken up and put down within the State, or taken up within to be carried without, cannot but affect in a greater or less degree those taken up without and brought within, and sometimes those taken up and put down without. A passenger in the cabin set apart for the use of whites without the State must, when the boat comes within, share the accommodations of that cabin with such colored persons as may come on board afterwards, if the law is enforced. It was to meet just such a case that the commercial clause in the Constitution was adopted. The

river Mississippi passes through or along the borders of ten different States, and its tributaries reach many more. . . . No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a state line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is untrammelled by state lines, has been invested with the exclusive legislative power of determining what such regulations shall be. If this statute can be enforced against those engaged in interstate commerce, it may be as well against those engaged in foreign; and the master of a ship clearing from New Orleans for Liverpool, having passengers on board, would be compelled to carry all, white and colored, in the same cabin during his passage down the river, or be subject to an action for damages, 'exemplary as well as actual,' by any one who felt himself aggrieved because he had been excluded on account of his color." The import of that decision is that, in the absence of legislation by Congress, a state enactment may so directly and materially burden interstate commerce as to be in itself a regulation of such commerce. We cannot perceive that there is any conflict between the decision in that case and that now made. The Louisiana statute, as interpreted by the court, embraced every passenger carrier coming into the State. The Ohio statute does not interfere at all with the management of the defendant's trains outside of the State, nor does it apply to all its trains coming into the State. It relates only to the stopping of a given number of its trains within the State at certain points, and then only long enough to receive and let off passengers. It so manifestly subserves the public convenience, and is in itself so just and reasonable, as wholly to preclude the idea that it was, as the Louisiana statute was declared to be, a direct burden upon interstate commerce, or a direct interference with its freedom.

The judgment in *Wabash, St. Louis & Pacific Railway* v. *Illinois* is entirely consistent with the views herein expressed.

A statute of Illinois was construed by the Supreme Court of that State as prescribing rates not simply for railroad transportation beginning and ending within Illinois, but for transportation between points in Illinois and points in other States under contracts for continuous service covering the entire route through several States. Referring to the principle contained in the statute, this court held that if restricted to transportation beginning and ending within the limits of the State it might be very just and equitable, but that it could not be applied to transportation through an entire series of States without imposing a direct burden upon interstate commerce forbidden by the Constitution. In the case before us there is no attempt upon the part of Ohio to regulate the movement of the defendant company's interstate trains throughout the whole route traversed by them. It applies only to the movement of trains while within the State, and to the extent simply of requiring a given number, if so many are daily run, to stop at certain places long enough to receive and let off passengers.

Nor is *Illinois Central Railroad* v. *Illinois* inconsistent with the views we have expressed. In that case a statute of Illinois was held, in certain particulars, to be unconstitutional, (although the legislation of Congress did not cover the subject,) as directly and unnecessarily burdening interstate commerce. The court said: " The effect of the statute of Illinois, as construed and applied by the Supreme Court of the State, is to require a fast mail train, carrying interstate passengers and the United States mail, from Chicago in the State of Illinois to places south of the Ohio River, over an interstate highway established by authority of Congress, to delay the transportation of such passengers and mails, by turning aside from the direct interstate route, and running to a station three miles and a half away from a point on that route, and back again to the same point, and thus travelling seven miles which form no part of its course, before proceeding on its way; and to do this for the purpose of discharging and receiving passengers at that station, for the interstate travel to and from which, it is admitted in this case, the railway company fur-

nishes other and ample accommodation. This court is unanimously of opinion that this requirement is an unconstitutional hindrance and obstruction of interstate commerce, and of the passage of the mails of the United States." Again: " It may well be, as held by the courts of Illinois, that the arrangement made by the company with the Post Office Department of the United States cannot have the effect of abrogating a reasonable police regulation of .the. State. But a statute of the State, which unnecessarily interferes with the speedy and uninterrupted carriage of the mails of the United States, cannot be considered as a reasonable police regulation." The statute before us does not require the défendant company to turn any of its train from their direct interstate route. Besides, it is clear that the particular question now presented was not involved in *Illinois Central Railroad* v. *Illinois;* for it is stated in the court's opinion that " the question whether a statute which merely required interstate railroad trains, without going out of their course, to stop at county seats, would be within the constitutional power of the State, is not presented, and cannot be decided, upon this record." The above extracts show the full scope of that decision. Any doubt upon the point is removed by the reference made to that case in *Gladson* v. *Minnesota,* 166 U. S. 427, 431.

It has been suggested also that the statute of Ohio is inconsistent with section 5258 of the Revised Statutes of the United States authorizing every railroad company in the United States operated by steam, its successors and assigns, " to carry upon and over its road, boats, bridges and ferries all passengers, troops, government supplies, mails, freight and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination." In *Missouri, Kansas & Texas Railway* v. *Haber,* 169 U. S. 613, 638, above cited,. it was held that the authority given by that statute to railroad companies to carry " freight and property " over their respective roads from one State to another State, did not authorize a railroad company to carry into a State

cattle known, or which by due diligence might be known, to be in such condition as to impart or communicate disease to the domestic cattle of such State; and that a statute of Kansas prescribing as a rule of civil conduct that a person or corporation should not bring into that State cattle known, or which by proper diligence could be known, to be capable of communicating disease to domestic cattle, could not be regarded as beyond the necessities of the case, nor as interfering with any right intended to be given or recognized by section 5258 of the Revised Statutes. And we adjudge that the above statutory provision was not intended to interfere with the authority of a State to enact such regulations, with respect at least to a railroad corporation of its own creation, as were not directed against interstate commerce, but which only incidentally or remotely affected such commerce, and were not in themselves regulations of interstate commerce, but were designed reasonably to subserve the convenience of the public.

Imaginary cases are put for the purpose of showing what might be done by the State that would seriously interfere with or discriminate against interstate commerce, if the statute in question be upheld as consistent with the Constitution of the United States. Without stopping to consider whether the illustrations referred to are apposite to the present inquiry, it is sufficient to say that it is always easy to suggest extreme cases for the application of any principle embodied in a judicial opinion. Our present judgment has reference only to the case before us, and when other cases arise in which local statutes are alleged not to be legitimate exertions of the police powers of the State, but to infringe upon national authority, it can then be determined whether they are to be controlled by the decision now rendered. It would be impracticable, as well as unwise, to attempt to lay down any rule that would govern every conceivable case that might be suggested by ingenious minds.

For the reasons stated the judgment of the Supreme Court of Ohio is

*Affirmed.*

MR. JUSTICE SHIRAS, with whom concurred MR. JUSTICE. BREWER and MR. JUSTICE PECKHAM, dissenting.

The Constitution of the United States, in its eighth section, confers upon Congress the power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes, and to establish post offices and post roads.

In pursuance of this power, Congress, on June 15, 1866, enacted that "every railroad company in the United States, whose road is operated by steam, its successors and assigns, is hereby authorized to carry upon and over its road, boats, bridges and ferries, all passengers, troops, government supplies, mails, freight and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation  ̮ the same to the place of destination." Rev. Stat. § 5258.

By the act of February 4, 1887, c. 104, entitled " An act to regulate commerce," 24 Stat. 379, Congress created the Interstate Commerce Commission, and enacted that the provisions of that act should " apply to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad, or partly by railroad and partly by water when both are used, under a common control, management or arrangement, for a continuous carriage or shipment from one State or Territory of the United States, or the District of Columbia, to any other State or Territory of the United States . . . ;" and that it should be unlawful for any common carrier, subject to the provisions of the act, to enter into any combination, contract or agreement, expressed or implied, to prevent, by change of time schedules, carriage in different cars, or by other means or devices, the carriage of freight from being continuous from the place of shipment to the place of destination.

It was said by this court, in *California* v. *Central Pacific Railroad*, 127 U. S. 1, 39, that "It cannot at the present day be doubted that Congress, under the power to regulate commerce among the several States, as well as to provide for

postal accommodations and military exigencies, had authority to pass these laws. The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from State to State, is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. This power in former times was exerted to a very limited extent — the Cumberland or National road being the most notable instance. Its exertion was but little called for, as commerce was then mostly conducted by water, and many of our statesmen entertained doubts as to the existence of the power to establish ways of communication by land. But since, in consequence of the expansion of the country, the multiplication of its products, and the invention of railroads and locomotion by steam, land transportation has so vastly increased, a sounder consideration of the subject has prevailed, and led to the conclusion that Congress has plenary power over the whole subject. Of course, the authority of Congress over the Territories of the United States, and its power to grant franchises exercisable therein, are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of railroads connecting the East with the Pacific, traversing States as well as Territories, and employing the agency of state as well as Federal corporations."

In the case of *Cincinnati, New Orleans and Texas Pacific Railway* v. *Interstate Commerce Commission*, 162 U. S. 184, the validity of the act of February 4, 1887, was sustained, and its provisions were held applicable even to a railroad company whose entire road was within the limits of the State of its creation, when, by agreeing to receive goods by virtue of foreign through bills of lading and to participate in through rates and charges, it became part of a continuous line of transportation.

By an act approved February 23, 1869, the State of Louisiana forbade common carriers of passengers to make dis-

crimination on account of race or color. A person of color took passage upon a steamboat plying between New Orleans and Vicksburg, in the State of Mississippi, and was carried from New Orleans to her place of destination within Louisiana, and being refused accommodations, on account of her color, in the cabin specially set apart for white persons, brought an action in the district court for the parish of New Orleans, under the provisions of the act above referred to. By way of defence it was insisted that the statute was void, in respect to the matter complained of, because, as to the business of the steamboat, it was an attempt to regulate commerce between the States, and therefore in conflict with the Constitution of the United States. The state court held that the statute was valid, and the case was brought to this court, where the judgment of the state court was reversed. *Hall* v. *De Cuir*, 95 U. S. 485, 488. The reasoning of the court is so closely applicable to the case before us that we quote a considerable part of the opinion:

" We think it may safely be said that state legislation which seeks to impose a direct burden upon interstate commerce, or to interfere directly with its freedom, does encroach upon the exclusive power of Congress. The statute now under consideration, in our opinion, occupies that position. It does not act upon the business through the local instruments to be employed after coming within the State, but directly upon the business as it comes into the State from without or goes out from within. While it purports only to control the carrier when engaged within the State, it must necessarily influence his conduct to some extent in the management of his business throughout his entire voyage. His disposition of passengers taken up and put down within the State, or taken up within to be carried without, cannot but affect in a greater or less degree those taken up without and brought within, and sometimes those taken up and put down without. A passenger in the cabin set apart for the use of whites without the State must, when the boat comes within, share the accommodations of that cabin with such colored persons as may come on board afterwards, if the law is enforced.

"It was to meet just such a case that the commercial clause in the Constitution was adopted. The river Mississippi passes through or along the borders of ten different States, and its tributaries reach many more. The commerce upon these waters is immense, and its regulation clearly a matter of national concern. If each State was at liberty to regulate the conduct of carriers while within its jurisdiction, the confusion likely to follow could not but be productive of great inconvenience and unnecessary hardships. Each State could provide for its own passengers and regulate the transportation of its own freight, regardless of the interests of others. Nay, more, it could prescribe rules by which the carrier must be governed within the State in respect to passengers and property brought from without. On one side of the river or its tributaries he might be required to observe one set of rules, and on the other another. Commerce cannot flourish in the midst of such embarrassments. No carrier of passengers can conduct his business with satisfaction to himself, or comfort to those employing him, if on one side of a state line his passengers, both white and colored, must be permitted to occupy the same cabin, and on the other be kept separate. Uniformity in the regulations by which he is to be governed from one end to the other of his route is a necessity in his business, and to secure it Congress, which is untrammelled by state lines, has been invested with the exclusive legislative power of determining what such regulations shall be. If this statute can be enforced against those engaged in interstate commerce, it may as well be against those engaged in foreign; and the master of a ship clearing from New Orleans for Liverpool, having passengers on board, would be compelled to carry all, white and colored, in the same cabin during his passage down the river, or be subject to an action for damages, exemplary as well as actual, by any one who felt himself aggrieved because he had been excluded on account of his color.

"This power of regulation may be exercised without legislation as well as with it. By refraining from action, Congress, in effect, adopts as its own regulations those which the common law, or the civil law where that prevails, has provided

for the government of each business, and those which the States, in the regulation of their domestic concerns, have established affecting commerce, but not regulating it within the meaning of the Constitution. In fact, congressional legislation is only necessary to cure defects in existing laws, as they are discovered, and to adapt such laws to new developments of trade. As was said by Mr. Justice Field, speaking for the court in *Welton* v. *Missouri,* 91 U. S. 275, 282 : 'Inaction [by Congress] is equivalent to a declaration that interstate commerce shall remain free and untrammelled.' Applying that principle to the circumstances of this case, congressional inaction left Benson [the captain of the steamboat] at liberty to adopt such reasonable rules and regulations for the disposition of passengers upon his boat, while pursuing her voyage within Louisiana or without, as seemed to him most for the interest of all concerned. The statute under which this suit is brought, as construed by the state court, seeks to take away from him that power so long as he is within Louisiana; and while recognizing to the fullest extent the principle which sustains a statute, unless its unconstitutionality is clearly established, we think this statute, to the extent that it requires those engaged in the transportation of passengers among the States to carry colored passengers in Louisiana in the same cabin with whites, is unconstitutional and void. If the public good requires such legislation, it must come from Congress and not from the States."

I am not able to think that this decision is satisfactorily disposed of, in the principal opinion, by citing it, and then dismissing it with the observation that it is not perceived that there is any conflict between it and that now made.

The State of Illinois enacted that if any railroad corporation shall charge, collect or receive for the transportation of any passenger or freight of any description upon its railroad, *for any distance within the State,* the same or a greater amount of toll or compensation than is at the same time charged, collected or received for the transportation in the same direction of any passenger or like quantity of freight, of the same class over a greater distance of the same road, all

such discriminating rates, charges, collections or receipts, whether made directly or by the means of rebate, drawback or other shift or evasion, shall be deemed and taken against any such railroad company as *prima facie* evidence of unjust discrimination prohibited by the provisions of the act. The act further provided a penalty of not over $5000, and also that the party aggrieved should have a right to recover three times the amount of damages sustained, with costs and attorneys' fees. Rev. Stat. Ill. c. 114, § 126.

An action to recover penalties under this statute was brought by Illinois against the Wabash, St. Louis and Pacific Railway Company, an Illinois corporation, in which the allegations were that the railroad company had charged Elder & Mc-Kinney for transporting goods from Peoria, in the State of Illinois, to New York City, at the rate of fifteen cents per hundred pounds for a carload; that on the same day the railroad company had charged one Bailey, for transporting simi-lar goods from Gilman to New York City, at the rate of twenty-five cents per hundred pounds per carload; that the carload for Elder & McKinney was carried eighty-six miles farther in the State of Illinois than the other carload of the same weight; that this freight being of the same class in both instances, and over the same road, except as to the difference in the distance, made a discrimination forbidden by the statute, whether the charge was regarded for the whole distance from the terminal point in Illinois to New York City, or the pro-portionate charge for the haul within the State of Illinois. Judgment went against the company in the courts of the State of Illinois, and the case was brought to this court.

It was here strenuously contended that, in the absence of congressional legislation, a state legislature has the power to regulate the charges made by the railroads of the State for transporting goods and passengers to and from places within the State, when such goods and passengers are brought from, or carried to, points without the State, and are, therefore, in the course of transportation from any State, or to another State. And of that view were several Justices of this court, who, in the opinion filed on their behalf, cited the very cases

that are cited and relied on in the majority opinion in the present case.

But the court did not so hold, *Wabash, St. Louis & Pacific Railway* v. *Illinois*, 118 U. S. 557, 572; and its reasoning is so plainly applicable to the question now before us, it may well be quoted at some length.

After having reviewed some of the previous cases, and having quoted those passages in the opinion of the court in *Hall* v. *De Cuir*, 95 U. S. 485, which have hereinbefore been quoted, Mr. Justice Miller, giving the opinion of the court, proceeded as follows:

"The applicability of this language to the case now under consideration, of a continuous transportation of goods from New York to Central Illinois, or from the latter to New York, is obvious, and it is not easy to see how any distinction can be made. Whatever may be the instrumentalities by which this transportation from the one point to the other is effected, it is but one voyage, as much so as that of the steamboat on the Mississippi River. It is not the railroads themselves that are regulated by this act of the Illinois legislature so much as the charge for transportation, and, in the language just cited, if each one of the States through whose territories these goods are transported can fix its own rules for prices, for modes of transit, for terms and modes of delivery, and all the other incidents of transportation to which the word 'regulation' can be applied, it is readily seen that the embarrassments upon interstate transportation, as an element of interstate commerce, might be too oppressive to be submitted to. 'It was,' in the language of the court cited above, 'to meet just such a case that the commerce clause of the Constitution was adopted.'

"It cannot be too strongly insisted upon that the right of continuous transportation from one end of the country to the other is essential in modern times to that freedom of commerce from the restraints which the States might choose to impose upon it, that the commerce clause was intended to secure. This clause, giving to Congress the power to regulate commerce among the States and with foreign nations, as this court has said before, was among the most important of the

subjects which prompted the formation of the Constitution. *Cook* v. *Pennsylvania*, 97 U. S. 566, 574; *Brown* v. *Maryland*, 12 Wheat. 419, 446. And it would be a very feeble and almost useless provision, but poorly adapted to secure the entire freedom of commerce among the States which was deemed essential to a more perfect union by the framers of the Constitution, if, at every stage of the transportation of goods and chattels through the country, the State within whose limits a part of this transportation must be done could impose regulations concerning the price, compensation or taxation, or any other restrictive regulation interfering with and seriously embarrassing this commerce.

"The argument on this subject can never be better stated than it is by Chief Justice Marshall in *Gibbons* v. *Ogden*, 9 Wheat. 1, 195–6. He there demonstrates that commerce among the States, like commerce with foreign nations, is necessarily a commerce which crosses state lines, and extends into the States, and the power of Congress to regulate it exists wherever that commerce is found. Speaking of navigation as an element of commerce, which it is, only, as a means of transportation, now largely superseded by railroads, he says: 'The power of Congress, then, comprehends navigation within the limits of every State in the Union, so far as that navigation may be, in any manner, "connected with commerce with foreign nations, or among the several States, or with the Indian tribes." It may, of consequence, pass the jurisdictional line of New York and act upon the very waters, [the Hudson River,] to which the prohibition now under consideration applies.' So the same power may pass the line of the State of Illinois and act upon its restriction upon the right of transportation extending over several States including that one.

"In the case of *Telegraph Co.* v. *Texas*, 105 U. S. 460, 465, the court held that 'a telegraph company occupies the same relation to commerce as a carrier of messages that a railroad company does as a carrier of goods,' and that both companies are instruments of commerce, and their business is commerce itself. . . . In the case of *Welton* v. *Missouri*, 91 U. S.

275, 280, it was said: 'It will not be denied that that portion of commerce with foreign nations and between the States which consists in the transportation and exchange of commodities is of national importance, and admits and requires uniformity of regulation. The very object of investing this power in the General Government was to insure this uniformity against discriminating state legislation.' And in *County of Mobile* v. *Kimball*, 102 U. S. 671, 702, the same idea is very clearly stated in the following language: 'Commerce with foreign countries and among the States, strictly considered, consists in intercourse and traffic, including in these terms navigation and the transportation and transit of persons and property, as well as the purchase, sale and exchange of commodities. For the regulation of commerce, as thus defined, there can be only one system of rules, applicable alike to the whole country; and the authority which can act for the whole country can alone adopt such a system. Action upon it by separate States is not, therefore, permissible. Language affirming the exclusiveness of the grant of power over commerce as thus defined may not be inaccurate, when it would be so if applied to legislation upon subjects which are merely auxiliary to commerce.' . . . We must, therefore, hold that it is not, and never has been, the deliberate opinion of a majority of this court, that the statute of a State which attempts to regulate the fares and charges by railroad companies within its limits, for a transportation which constitutes a part of commerce among the States, is a valid law.

"Let us see precisely what is the degree of interference with the transportation of property or persons from one State to another which this statute proposes. A citizen of New York has goods which he desires to have transported by the railroad companies from that city to the interior of the State of Illinois. A continuous line of rail over which a car loaded with these goods can be carried, and is carried habitually, connects the place of shipment with the place of delivery. He undertakes to make a contract with a person engaged in the carrying business at the end of this route from whence the goods are to start, and he is told by the carrier, 'I am free to make a fair

and reasonable contract for this carriage to the line of the State of Illinois, but when the car which carries these goods is to cross the line of that State, pursuing at the same this continuous track, I am met by a law of Illinois which forbids me to make a free contract concerning this transportation within that State, and subjects me to certain rules by which I am to be governed as to the charges which the same railroad company in Illinois may make, or has made, with reference to other persons and other places of delivery.' So that while that carrier might be willing to carry these goods from the city of New York to the city of Peoria at the rate of fifteen cents per hundred pounds, he is not permitted to do so because the Illinois railroad company has already charged at the rate of twenty-five cents per hundred pounds for carriage to Gilman, in Illinois, which is eighty-six miles shorter than the distance to Peoria.

" So also, in the present case, the owner of corn, the principal product of the country, desiring to transport it from Peoria, in Illinois, to New York, finds a railroad company willing to do this at the rate of fifteen cents per hundred pounds for a carload, but he is compelled to pay at the rate of twenty-five cents per hundred pounds, because the railroad company has received from a person residing at Gilman twenty-five cents per hundred pounds for the transportation of a carload of the same class of freight over the same line of road from Gilman to New York. This is the result of the statute of Illinois, in its endeavor to prevent unjust discrimination, as construed by the Supreme Court of that State. The effect of it is, that whatever may be the rate of transportation per mile charged by the railroad company from Gilman to Sheldon, a distance of twenty-three miles, in which the loading and unloading of the freight is the largest expense incurred by the railroad company, the same rate per mile must be charged from Peoria to the city of New York.

" The obvious injustice of such a rule as this, which railroad companies are by heavy penalties compelled to conform to, in regard to commerce among the States, when applied to transportation which includes Illinois in a long line of carriage

through several States, shows the value of the constitutional provision which confides the power of regulating interstate commerce to the Congress of the United States, whose enlarged view of the interests of all the States, and of the railroads concerned, better fits it to establish just and equitable rates.

"Of the justice or propriety of the principle which lies at the foundation of the Illinois statute, it is not the province of this court to speak. As restricted to a transportation which begins and ends within the limits of the State, it may be very just and equitable, and it certainly is the province of the state legislature to determine that question. But when it is attempted to apply to transportation through an entire series of States a principle of this kind, and each one of the States shall attempt to establish its own rates of transportation, its own methods to prevent discrimination in rates, or to permit it, the deleterious influence upon the freedom of commerce among the States and upon the transit of goods through those States cannot be overestimated. That this species of regulation is one which must be, if established at all, of a general and national character, and cannot be safely and wisely remitted to local rules and local regulations, we think is clear from what has already been said. And if it be a regulation of commerce, as we think we have demonstrated it is, and as the Illinois court concedes it to be, it must be of that national character, and the regulation can only appropriately exist by general rules and principles which demand that it should be done by the Congress of the United States under the commerce clause of the Constitution."

This case, so recent and so elaborately considered, has not received adequate attention in the opinion of the court in the present case.

The legislature of Illinois, by the statute of February 10, 1851, incorporated the Illinois Central Railroad Company, and empowered it to construct and maintain a railroad, with one or more tracks, from the southern terminus of the Illinois and Michigan Canal to a point at the city of Cairo, with the same to the city of Chicago on Lake Michigan, and also a branch

via the city of Galena to a point on the Mississippi River opposite the town of Dubuque, in the State of Iowa. The Chicago, St. Louis and New Orleans Railroad Company, a consolidated company formed under the legislatures of the States of Louisiana, Mississippi, Tennessee and Kentucky, whose line extended from New Orleans to the Ohio River, built a railroad bridge across the Ohio River to low-water mark on the Illinois side, to which the jurisdiction of the State of Kentucky extended. The north end of this bridge was at a part of Cairo about two miles north of the station of the Illinois Central Railroad Company in that city; and the peculiar conformation of the land and water made it impracticable to put the bridge nearer the junction of the Ohio and Mississippi rivers. By this bridge the road of the Illinois Central Railroad Company was thereby connected with that of the Chicago, St. Louis and New Orleans Railroad Company. Thereafter the Illinois Central Railroad Company put on a daily fast mail train, to run from Chicago to New Orleans, carrying passengers as well as the United States mail, not going to or stopping at its station in Cairo, but local trains adequate to afford accommodations for passengers to or from Cairo were run daily on that part of the railroad between the Bridge Junction and Cairo. By a subsequent act of 1889 it was enacted by the legislature of Illinois that "every railroad corporation shall cause its passenger trains to stop upon its arrival at each station, advertised by such corporation as a place for receiving and discharging passengers upon and from such trains, a sufficient length of time to receive and let off such passengers with safety: *Provided*, All regular passenger trains shall stop a sufficient length of time, at the railroad station of county seats, to receive and let off passengers with safety."

In April, 1891, a petition was filed in the Circuit Court for Alexander County, in the State of Illinois, by the county attorney in behalf of the State, alleging that the Illinois Central Railroad Company ran its southbound fast mail train through the city of Cairo, two miles north of its station in that city, and over a bridge across the Ohio River, connecting its road with other roads south of that river, without stopping

at its station in Cairo, and praying for a writ of mandamus to compel it to cause all its passenger trains, coming into Cairo, to be brought down to that station, and there stopped a sufficient length of time to receive and let off passengers with safety.

The railroad company contended that the statute did not require its fast mail train to be run to and stopped at its station in Cairo, and that the statute was contrary to the Constitution of the United States, as interfering with interstate commerce, and with the carrying of the United States mail. The court granted the writ of mandamus, and the railroad company appealed to the Supreme Court of the State, which affirmed the judgment, and held that the statute of Illinois concerning the stoppage of trains obliged the defendant to cause its fast mail train to be taken into its station at Cairo, and be stopped there long enough to receive and let off passengers with safety, and that the statute, so construed, was not an unconstitutional interference with interstate commerce, or with the carrying of the United States mails. The case was brought to this court, where the judgment of the Supreme Court of Illinois was reversed in a unanimous opinion delivered by Mr. Justice Gray. *Illinois Central Railroad* v. *Illinois*, 163 U. S. 142, 153. After reciting several statutes of Illinois and of Congress, particularly the act of June 15, 1866, wherein Congress, for the declared purpose of facilitating commerce among the several States, and the postal and military communications of the United States, authorized every railroad company in the United States, whose road was operated by steam, to carry over its road, bridges and ferries, as well passengers and freight, as government mails, troops and supplies, from one State to another, and to connect, in any State authorizing it to do so, with roads of other States, so as to form a continuous line of transportation, the court proceeded to say:

"The effect of the statute of Illinois, as construed and applied by the Supreme Court of the State, is to require a fast mail train, carrying interstate passengers and the United States mails, from Chicago, in the State of Illinois, to places south of the Ohio River, over an interstate highway established

by authority of Congress, to delay the transportation of such passengers and mail, by turning aside from the direct interstate route, and running to a station three miles and a half away from a point on that route, and back again to the same point, and thus travelling seven miles which form no part of its course, before proceeding on its way; and to do this for the purpose of discharging and receiving passengers at that station, for the interstate travel to and from which, as is admitted in this case, the railroad company furnishes other and ample accommodation. This court is unanimously of opinion that this requirement is an unconstitutional hindrance and obstruction of interstate commerce, and of the passage of the mails of the United States. Upon the state of facts presented by this record, the duties of the Illinois Central Railroad Company were not confined to those which it owed to the State of Illinois under the charter of the company and other laws of the State; but included distinct duties imposed upon the corporation by the Constitution and laws of the United States.

"The State may doubtless compel the railroad company to perform the duty imposed by its charter of carrying passengers and goods between its termini within the State. But so long, at least, as that duty is adequately performed by the company, the State cannot, under the guise of compelling its performance, interfere with the performance of paramount duties to which the company has been subjected by the Constitution and laws of the United States.

"The State may make reasonable regulations to secure the safety of passengers, even on interstate trains, while within its borders. But the State can do nothing which will directly burden or impede the interstate traffic of the company, or impair the usefulness of its facilities for such traffic."

Beyond the bare allegation that the case of *Illinois Central Railroad* v. *Illinois* is not inconsistent with the views expressed in the present case, no attempt is made to compare or reconcile the principles involved in the two cases. It is, indeed, said that the Ohio statute "does not require the defendant company to turn any of its trains from their direct interstate route;" and the remark of the court in the *Illinois case* is

cited, in which it was said "the question whether a statute which merely required interstate railroad trains, without going out of their course, to stop at county seats, would be within the constitutional power of the State, is not presented, and cannot be decided, upon this record." Reference is also made to the case of *Gladson* v. *Minnesota*, 166 U. S. 427, as removing any doubt as to the scope of the decision in the *Illinois case*.

But an examination of that case will show that no question was presented or decided as to the power of a State to compel interstate railroad trains to stop at all county seats through which they might pass. On the contrary, the court was careful to say, distinguishing it from the *Illinois case:* "But, in the case at bar, the train in question ran wholly within the State of Minnesota, and could have stopped at the county seat of Pine County without deviating from its course;" and to point out that the statute of Minnesota expressly provided that "*this act shall not apply to through railroad trains entering this State from any other State, or to transcontinental trains of any railroad.*"

On what then does the court's opinion rely to distinguish the *Illinois case* from the present case? Merely that the through train in the one case was obliged to go out of its direct route some three or four miles, while in the other the obligation is to stop at towns through which the trains pass. But what was the *reason* why this court held that the Illinois statute was void as an interference with interstate commerce? Was not the *delay* thus caused the sole reason? And is there any difference between a delay caused by having to go a few miles out of a direct course in a single instance, and one caused by having to stop at a number of unimportant towns? Probably the excursion to the Cairo station did not detain the Illinois train more than half an hour; and it is admitted in the present case that the number of villages in Ohio through which the trains passed were thirteen, and that the average time required to stop a train of cars and receive and leave off passengers would be three minutes at each station, to say nothing of the time expended in losing and in regaining headway. Besides the delays thus caused, there would be many

inconveniences to the railroad companies and to the travelling public occasioned by interfering with regulations made for the comfort and safety of through passengers.

*Western Union Telegraph Co.* v. *James*, 162 U. S. 650, is cited by the court as sustaining its present position. But that was a case in which the legislation of the State was of a nature that was in aid of the performance of the duty of the company that would exist in the absence of any such statute, and was in nowise obstructive of its duty as a telegraph company, and the decision of this court was expressly put upon that ground. It was pointed out, in the opinion, that the legislation in question could in no way affect the conduct of the company with regard to the performance of its duties in other States, and that such important particular distinguished the case from *Hall* v. *De Cuir*, 95 U. S. 485, and from *Western Union Telegraph Co.* v. *Pendleton*, 122 U. S. 347.

*Richmond & Alleghany Railroad* v. *Patterson Tobacco Co.*, 169 U. S. 311, is cited as adjudging that a statute of Virginia, defining the obligations of carriers who accept for transportation anything directed to points of destination beyond the termini of their own lines or routes, was not, in its application to interstate business, a regulation of interstate commerce within the meaning of the Constitution. But the holding in that case simply was that the statute in question did not attempt to substantially regulate or control interstate shipments, but merely established a rule of evidence, ordaining the character of proof by which a carrier may show that, although it received goods for transportation beyond its own line, nevertheless by agreement its liability was limited to its own line — that the lawful exercise by a State of its power to determine the form in which contracts may be proven does not amount to a regulation of interstate commerce. The reasoning of the court went upon the assumption that if the statute was not merely a rule of evidence, but an attempt to regulate interstate commerce, it would have been void.

Reference is also made, in the principal opinion, to *Missouri, Kansas & Texas Railway* v. *Haber*, 169 U. S. 613. There an attack was made on the validity of legislation of the State

of Kansas, subjecting any person or persons who should bring into that State any cattle liable or capable of communicating "Texas or splenetic fever" to any domestic cattle of Kansas to a civil action for damages. In such an action it was contended, on behalf of the defendant, that the Kansas statutes were an interference with the freedom of interstate commerce, and also covered a field of action actually occupied by Congressional legislation, known as the Animal Industry Act. But it appeared that the Kansas act, under which the action was brought, was passed in 1885 and amended in 1891, and that Congress had previously invited the authorities of the States and Territories concerned to coöperate for the extinction of contagious or communicable cattle diseases. Act of May 29, 1884, c. 60, 23 Stat. 31. And accordingly a majority of this court held that the statutory provisions of Kansas were not inconsistent with the execution of the act of Congress, but constituted an exercise of the coöperation desired. Otherwise the case would have fallen within the ruling in *Railroad Co.* v. *Husen,* 95 U. S. 465, where a similar statute of the State of Missouri, passed before the legislation by Congress, and prohibiting the bringing of Texas cattle into the State of Missouri between certain times fixed by the statute, was held to be in conflict with the commerce clause of the Constitution, and not a legitimate exercise of the police power of the State.

The case of *Hennington* v. *Georgia,* 163 U. S. 299, demands notice. In it was involved the validity of what is known as the Sunday law of Georgia. That statute forbade the running in Georgia of railroad freight trains on the Sabbath day. The Supreme Court of Georgia held the statute to be a regulation of internal police and not of commerce, and that it was not in conflict with the Constitution of the United States even as to freight trains passing through the State from and to adjacent States, and laden exclusively with freight received on board before the trains entered Georgia and consigned to points beyond its limits.

It was shown, in that case, that it had been the policy of Georgia, from the earliest period of its history, to forbid all persons, under penalties, from using the Sabbath as a day of

labor and for pursuing their ordinary callings, and that the legislation in question was enacted in the exercise of that policy. It was said in the opinion of the Supreme Court of Georgia, which was brought to this court for review, that "with respect to the selection of the particular day in each week which has been set apart by our statute as the rest day of the people, religious views and feelings may have had a controlling influence. We doubt not that they did have; and it is notable that the same views and feelings had a very powerful influence in dictating the policy of setting apart any day whatever as a day of enforced rest." And it was said in the opinion of this court that "in our opinion there is nothing in the legislation in question which suggests that it was enacted with the purpose to regulate interstate commerce, or with any other purpose than to prescribe a rule of civil duty for all who, on the Sabbath day, are within the territorial jurisdiction of the State."

If, as has often been said, Christianity is part of the common law of the several States, and if the United States, in their legislative and executive departments throughout the country, since the foundation of the government, have recognized Sunday as a day of rest and freedom from compulsory labor, then such a law as that of Georgia, being based upon a public policy common to all the States, might be sustained.

But, if put upon the ground now declared in the opinion of the court in the present case, namely, as an exercise of the police power of the State, and, as such, paramount to the control of Congress in administering the commerce clause of the Constitution, then it is apparent, as I think, that the decision in *Hennington* v. *Georgia* was wrong, and the judges dissenting in that case were right.

For if, as a mere matter of local policy, one State may forbid interstate trains from running on the Christian Sabbath, an adjoining State may select the Jewish or Seventh Day Sabbath as the day exempt from business. Another State may choose to consecrate another day of the week in commemoration of the Latter Day Saint and Prophet who founded such State, as the proper day for cessation from daily labor.

Or, what is more probable, one or more of the States may think fit to declare that one day in seven is not a sufficient portion of the time that should be exempted from labor, and establish two or more days of rest. The destructive effect of such inconsistent and diverse legislation upon interstate commerce, carried on in trains running throughout the entire country, is too obvious to require statement or illustration.

But whatever may be said of the decision in *Hennington* v. *Georgia*, it is, as I think, quite apparent that the Ohio legislation, now under consideration, cannot be reconciled with the principles and conclusions of the other cases cited.

The principal facts of this case, as found by the trial court, were: "That the defendant company is a corporation organized under the laws of the States of New York, Pennsylvania, Ohio, Indiana, Michigan and Illinois, and that its railroad is operated from Chicago to Buffalo; that said defendant was on and prior to October 9, 1890, and has been ever since, engaged in carrying passengers and freight over said railroad, through and into each of said several States, and is and was then engaged in the business of interstate commerce, both in the carriage of passengers and freight from, into and through said States; that said defendant did not on said 9th day of October, 1890, nor shortly prior thereto, or since, up to the time of the commencement of this suit, run daily, both ways or either way, over said road through the village of West Cleveland, three regular trains nor more than one regular train each, carrying passengers, which were not engaged in interstate commerce, and that did not have upon them passengers who had paid through fare, and were entitled to ride on said trains going in the one direction from the city of Chicago to the city of Buffalo, and those going in the other direction from the city of Buffalo through said States to the city of Chicago; that on or about the said day the defendant operated but one regular train carrying passengers each way, that was not engaged in carrying such through passengers; and said train did stop at West Cleveland, on the day aforesaid, for a time sufficient to receive and let off passengers; that the through trains that passed through West Cleveland

on the said day were train No. 1, limited express, with two express cars, one coach and three sleepers, from New York to Chicago; train No. 11, fast mail, with five United States mail cars, one coach and sleeper, from New York to Chicago; train No. 21 had one United States mail car, two baggage and express cars, four coaches and one sleeper, from Cleveland to Chicago — these were western trains; that the eastern trains were limited express No. 4, with one baggage and express car and three sleepers from Chicago to New York; train No. 6, with one baggage and express car, three coaches and two sleepers, from Chicago to New York; train No. 24, with one United States mail, two baggage and express cars and seven coaches, from Chicago to Buffalo; train No. 14, with three United States mail cars and one sleeper, from Chicago to New York. That the average time of delay necessarily required to stop a train of cars and sufficient time to receive and let off passengers would be three minutes; and that the number of cities and villages in the State of Ohio, containing three thousand inhabitants each, through which the aforesaid trains of the defendant passed on said day, were thirteen."

It is, therefore, a conceded fact in the case that the through trains, which the legislature of Ohio seeks to compel to stop at prescribed villages and towns in that State, are engaged in carrying on interstate commerce by the transportation of freight and passengers. It is obvious, further, that such trains are within section 5258 of the Revised Statutes of the United States, authorizing such railroad companies "to carry upon and over its road, boats, bridges and ferries, all passengers, troops, government supplies, mails, freight and property on their way from any State to another State, and to receive compensation therefor, and to connect with roads of other States so as to form continuous lines for the transportation of the same to the place of destination."

It is also plain that the defendant railroad company and such of its trains as were engaged in interstate commerce are within the scope and subject to the regulations contained in the "act to regulate commerce," approved February 4, 1887, creating the Interstate Commerce Commission.

The theory on which passenger trains to traverse several States, or the entire continent, is prepared, is necessarily and widely different from that followed in making up ordinary trains to do a wayside business. There must be provision for sleeping at night, and for furnishing meals. In order that each and every passenger may receive the accommodation for which he pays, the seats are sold in advance, and with reference to the number of through passengers. To enable such trains to maintain the speed demanded, the number of the cars for each train must be limited, and they are advertised and known as "limited" trains. A traveller purchasing tickets on such trains has a right to expect that he will be carried to his journey's end in the shortest possible time, consistent with safety. The railroad companies compete for business by holding out that they run the fastest trains and those most certain to arrive on time. A company which, by its own regulations or under coercion of a state legislature, stopped its through trains at every village, would soon lose its through business, to the loss of the company and the detriment of the travelling public.

Nor must the necessity of the speedy transit of the United States mails be overlooked. The Government has not thought fit to build and operate railroads over which to transport its mails, but relies upon the use of roads owned by state corporations operating connecting roads. And it appears, from the findings in this case, that the defendant's through trains are engaged by the Government in the transportation of its mails. The business, public and private, that depends on hourly and daily communication by mail is enormous, and it would be intolerable if such necessary rapidity of intercourse could be controlled and trammelled by legislation like that in question.

It was pointed out in *Hall* v. *De Cuir* that, although the statute of Louisiana, which sought to regulate the manner in which white and colored passengers should be carried, was restricted by its own terms to the limits of the State, yet that such regulation necessarily affected steamboats running through and beyond the State, because such regulations might change at every state line.

A similar but much greater inconvenience would be occasioned by attempting by state legislation to interfere with the movements of through trains. If, for instance, and as is often the case, the through trains were full of through passengers, there would be no advantage to local travel for them to stop at the way stations, for there would be no room or accommodation for the occasional passengers. Nor would that difficulty be obviated by attaching to each train coaches for use at the way stations. Such additional coaches would impede the speed of the through trains, and interfere with the business of the local trains.

In *Wabash Railway Company* v. *Illinois,* it was said, replying to the argument that the state statute applied in terms only to transportation within the State: "Whatever may be the instrumentalities by which this transportation from the one point to the other is effected, it is but one voyage, as much so as that of the steamboat on the Mississippi River. It is not the railroads themselves that are regulated by this act of the Illinois legislature so much as the charge for transportation, and if each one of the States through whose territories these goods are transported can fix its own rules for prices, for modes of transit, for times and modes of delivery, and all the other incidents of transportation to which the word 'regulation' can be applied, it is readily seen that the embarrassments upon interstate transportation, as an element of interstate commerce, might be too oppressive to be submitted to. . . . As restricted to a transportation which begins and ends within the limits of the State, it, the regulation, may be very just and equitable, and it certainly is the province of the state legislature to determine that question. But when it is attempted to apply to transportation through an entire series a principle of this kind. and each one of the States shall attempt to establish its own rates of transportation, its own methods to prevent discrimination in freights, or to permit it, the deleterious influence upon the freedom of commerce among the States and upon the transit of goods through those States cannot be overestimated."

In *Illinois Central Railroad* v. *Illinois,* stress was justly

laid on the manifest purpose of Congress to establish a rail-
road in the centre of the continent, connecting the waters of
the Great Lakes with those of the Gulf of Mexico, for the
benefit of interstate commerce, as well as of the military and
postal departments of the government.

A similar purpose has been manifested by Congress, in the
legislation hereinbefore referred to, by authorizing the forma-
tion of continuous lines of transportation, by creating a per-
manent commission to supervise the transactions of railroad
companies so far as they affect interstate commerce, and by
employing such continuous and connecting roads for the
transportation of its mails, troops and supplies.

These views by no means result in justifying the railroad
company defendant in failing to supply the towns and villages
through which it passes with trains adequate and proper to
transact local business. Such failure is not alleged in this
case, nor found to be a fact by the trial court. And if the
fact were otherwise, the remedy must be found in suitable
legislation or legal proceedings, not in an enactment to con-
vert through into local trains.

Some observations may be ventured on the reasoning em-
ployed in the opinion of the court. It is said :

"In what has been said we have assumed that the statute
is not in itself *unreasonable.* In our judgment this assump-
tion is not unwarranted. The requirement that a railroad
company whose road is operated within the State shall cause
three, each way, of its regular trains carrying passengers, if
so many are run daily, Sundays excepted, to stop at any sta-
tion, city or village, of three thousand inhabitants, for a time
sufficient to receive and let off passengers, so far from being
*unreasonable,* will subserve the public convenience."

But the question of the *reasonableness* of a public statute is
never open to the courts. It was not open even to the Supreme
Court of the State of Ohio to say whether the act in question
was reasonable or otherwise. Much less does the power of
the legislature of Ohio to pass an act regulating a railroad
corporation depend upon the judgment or opinion of *this* court
as to the reasonableness of such an act.

And again: "It was for the State of Ohio to take into consideration all the circumstances affecting passenger travel within its limits, and, as far as practicable, make such regulations as were just to all who might pass over the road in question. It was not bound to ignore the convenience of its own people, whether travelling on this road from one point to another within the State, or from places in the State to places beyond its limits, or the convenience of those outside the State who wish to come into it, and look only to the convenience of those who desired to pass through the State without stopping."

It was, I respectfully submit, just such action on the part of the State of Ohio, and just such reasoning made to support that action, that are forbidden by the Constitution of the United States and by the decisions of this court, hereinbefore cited. If each and every State, through which these interstate highways run, could take into consideration all the circumstances affecting passenger travel within its limits, and make such regulations as, in the opinion of its legislature, are *"just and for the convenience of its own people,"* then we should have restored the confusion that existed in commercial transactions before the adoption of the Constitution, and thus would be overruled those numerous decisions of this court, nullifying state legislation proceeding on such propositions.

Again it is said:

"Any other view of the relations between the State and the corporation created by it would mean that the directors of the corporation could manage its affairs solely with reference to the interests of stockholders, and without taking into consideration the interests of the general public. It would mean not only that such directors were the exclusive directors of the manner in which the corporation should discharge the duties imposed upon it in the interest of the public, but that the corporation, by reason of being engaged in interstate commerce, could build up cities and towns at the ends of its line, or at favored points, and by that means destroy or retard the growth and prosperity of intervening points. It would mean that the defendant railway company could, beyond the

power of the State to prevent it, run all of its trains through the State without stopping at any city within its limits, however numerous the population of such cities."

I am unable to perceive, in the views that prevailed in the *Louisiana* and *Illinois cases,* any foundation whatever, for such observations. In those cases it was expressly conceded that, in the regulation of commerce within the State and in respect to the management of trains so engaged, the authority of the state legislature is supreme. And, in the argument in behalf of the defendant company in this case, a similar admission is made.

It is fallacious, as I think, to contend that the Ohio legislation in question was enacted to promote *the public interest.* That can only mean the public interest of the State of Ohio, and the reason why such legislation is pernicious and unsafe is because it is based upon a discrimination in favor of local interests, and is hostile to the larger public interest and convenience involved in interstate commerce. Practically there may be no real or considerable conflict between the public interest that is local and that which is general. But, as the state legislatures are controlled by those who represent local demands, their action frequently results in measures detrimental to the interests of the greater public, and hence it is that the people of the United States have, by their constitution and the acts of Congress, removed the control and regulation of interstate commerce from the state legislatures.

Countenance seems to be given, in the opinion of the majority, to the contention that the power of Congress over the regulation of interstate commerce is not exclusive, by the observation that "the plaintiff in error accepted its charter subject necessarily to the condition that it would conform to such reasonable regulations as the State might, from time to time, establish, that were not in violation of the supreme law of the land. In the absence of legislation by Congress, it would be going very far to hold that such an enactment as the one before us is in itself a regulation of interstate commerce when applied to trains carrying passengers from one State to another."

But it has already been shown that Congress has legislated expressly in relation to interstate trains and railroads, has made rules and regulations for their control, and has established a tribunal to make other rules and regulations.

Besides, as was observed by Mr. Webster, in his argument in *Gibbons* v. *Ogden*, 9 Wheat. 1, 17: " The State may legislate, it is said, whenever Congress has not made a plenary exercise of its power. But who is to judge whether Congress has made this plenary exercise of power. It has done all that it deemed wise; and are the States now to do whatever Congress has left undone? Congress makes such rules as in its judgment the case requires, and those rules, whatever they are, constitute the system. All useful regulations do not consist in restraint; and that which Congress sees fit to leave free is a part of the regulation as much as the rest."

Attention is called to the fact that in the cases of *Hall* v. *De Cuir, Wabash Railway Company* v. *Illinois* and *Illinois Railroad* v. *Illinois*, there were no specific regulations by Congress as to providing separate accommodations for white and black passengers, as to rates of freight to be charged on interstate commerce, or as to stopping through trains at prescribed places, yet legislation by the States on those subjects was held void by this court as a trespass on the field of interstate commerce.

" The power of Congress to regulate commerce among the several States when the subjects of that power are national in their nature, is also exclusive. The Constitution does not provide that interstate commerce shall be free, but, by the grant of this exclusive power to regulate it, it was left free, except as Congress might impose restraint. Therefore it has been determined that the failure of Congress to exercise this exclusive power in any case is an expression of its will that the subject shall be free from restrictions or impositions upon it by the several States." *In re Rahrer*, 140 U. S. 545.

MR. JUSTICE WHITE dissenting.

The statute is held not to be repugnant to the Constitution of the United States, because it is assumed to be but an exer-

cise of the lawful police power of the State, providing for the local convenience of its inhabitants. On this hypothesis, the statute is held valid, although it is conceded that it indirectly touches interstate commerce and remotely imposes a burden thereon. To my mind the Ohio statute, however, does not come within the purview of the reasoning advanced to support it, and therefore such considerations become irrelevant, and it is unnecessary to form any judgment as to their correctness.

My conception of the statute is that it imposes, under the guise of a police regulation for local convenience, a direct burden on interstate commerce, and, besides, expressly discriminates against such commerce, and therefore it is in conflict with the Constitution, even by applying the rules laid down in the authorities which are relied on as upholding its validity. Now, what does the statute provide? Does it require all railroads within the State to operate a given number of local trains and to stop them at designated points? Not at all. It commands railroads, *if they run three trains a day,* to cause at least three of such trains to be local trains, by compelling them to stop such trains at the places which the statute mentions. It follows then that under the statute one railroad, operating in the State, may be required to run only one local train a day and to stop such train, as the statute requires, and another railroad, reaching exactly the same territory and passing the same places, may be required to operate three trains a day and make the exacted stops with each of such trains. That is to say, although the same demands and the same local interest may exist as to the two roads, upon one is imposed a threefold heavier burden than upon the other. That this result of the statute is a discrimination it seems to me, in reason, is beyond question. If then the discrimination is certain, the only question which remains is, is it a discrimination against interstate commerce? If it is, confessedly the statute is repugnant to the Constitution of the United States. Whence then does the discrimination arise and upon what does it operate? It arises, alone, from the fact that the statute bases its requirement, not upon the demands of local con-

venience, but upon the volume of business done by the road, since it requires the road operating three trains to stop three as local trains, and the road operating one train to stop only one. But the number of trains operated is necessarily dependent upon the amount of business done, and the amount of business embraces interstate commerce as well as local business. But making the number of local trains dependent upon the volume of business is but to say that if a railroad has enough interstate business, besides its local business, to cause it to run one local and two interstate commerce trains each way each day, the increased trains thus required for the essential purposes of interstate commerce shall be local trains, whilst another railroad, which has no interstate commerce but only local business, requiring but one train a day, shall continue only to operate the one local train.

Whilst the power of the State of Ohio to direct all the railroads within its territory, to operate a sufficient number of local trains to meet the convenience of the inhabitants of the State may be *arguendo* conceded — although such question does not arise in this case and is not therefore necessary in my opinion to be decided — that State cannot, without doing violence to the commerce clause of the Constitution of the United States, impose upon the railroads operating within its borders a burden based, not upon local convenience, but upon the amount of interstate commerce business which the roads may do, thereby causing every interstate commerce railroad to have a burden resting upon it entirely disproportioned to local convenience and greatly more onerous than that resting upon roads doing a local business, and which have not a sufficient interstate business to compel them to operate three trains. To answer this reasoning by saying that the statute does not compel roads to operate the three trains and stop them, since it only compels them to stop them if they operate them, is to admit the discrimination, and to state the fact that the duty is not made by the statute dependent upon the local convenience, but upon the whole volume of business, which of course therefore includes interstate commerce business.

As the statute makes its exaction depend not upon a rule

by which the local wants are ascertained and supplied, but upon the business done, it therefore directly operates upon the volume of business, and only indirectly considers the possible local convenience. Under a law which thus proceeds, my mind refuses the conclusion that the law directly considers local convenience and only indirectly and remotely affects interstate commerce, when the reverse, it seems to me, is patent on the face of the statute. The repugnancy of the statute to the Constitution of the United States is shown by the principle decided by this court in *Osborne* v. *Florida*, 164 U. S. 650. In that case the State of Florida imposed a license on the business of express companies. In construing the statute, the Supreme Court of the State held that it applied only to business done solely within the State and not to business interstate in its character. This court, in reviewing and affirming the decision of the state court, said that as construed by the Florida court the statute was not repugnant to the Constitution, because it applied to business done solely within the State, and that the contrary would have been manifestly the case if, for the purpose of taxation, the State had taken into consideration the whole volume of business, including that of an interstate character. Now, if a taxing law of a State is repugnant to the Constitution because it operates upon the whole volume of business, both state and interstate, a law of the character of that now under consideration, which operates upon the whole volume of business of a railroad, state and interstate, is equally repugnant to the Constitution of the United States.

Whether in the enactment of the statute it was intended to discriminate is not the question, for, whatever may have been the intention of the lawmaker, if the necessary effect of the criterion established by the law is to cause its enforcement to produce an unlawful discrimination against interstate commerce by imposing a greater burden on the roads engaged in such commerce than upon other roads which do a purely local business, the statute is, I think, repugnant to the Constitution of the United States, and should not be upheld.

For these reasons, without meaning to imply that I do not assent to the conclusions stated by my brethren who have also,

on other grounds, dissented, I prefer to place my dissent on what seems to me the discrimination which the statute inevitably creates.