MISSOURI, K. & T. RY. CO. v. TOWN OF NORFOLK *et al.*

No. 665. Opinion Filed December 7, 1909,

(107 Pac. 172.)

**RAILROADS—Regulation—Order Requiring Trains to Stop at Station—"Adequate and Reasonable Facilities."** Where a railroad company has provided adequate and reasonable facilities for the accommodation of traffic to and from a certain place, an order of the Corporation Commission, .requiring it to stop another train engaged in interstate commerce at said point, is unreasonable.

(a) The term "adequate and reasonable facilities" is not capable of exact definition, being a relative expression, and calls for such facilities as may be fairly demanded; regard being had to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodation asked for, and to all other facts which would have a bearing upon the question of convenience and cost. **Schmidt v. Ry. Co.,** 4 Wis. Railroad Commission Reports, p. 121.

(Syllabus by the Court.)

*Appeal from the Corporation Commission.*

The Missouri, Kansas & Texas Railway Company was . required by the Corporation Commission to stop certain trains at the town of Norfolk, and appeals from the order. Affirmed in part, and reversed in part.

*Clifford L. Jackson,* for appellant.—Citing: *Illinois Cent. R. Co. v. Illinois,* 163 U. S. 142; *Atlantic C. L. R. Co. v. Wharton,* 207 U. S. 328; *Miss. Railroad Com. v. Illinois Cent. R. Co.,* 203 U. S. 335; *Cleveland, etc., R. Co. v. Illinois,* 177 U. S. 514.

*George A. Henshaw,* Asst. Atty. Gen., for appellees.—Citing: *State .v. Gladson,* 57 Minn. 585, 166 U. S. 427; *State v. New Haven & N. Co.,* 43 Conn. 351, 104 U. S. 1; *L. & A. R. Co. v. State,* 85 Ark. 12; *Lakeshore & M. S. R. Co. v. Ohio,* 173 U. S. 285; *Minneapolis, etc., R. Co. v. Railroad Com. of Wisconsin,* 17 L. R. A. (N. S.) 821.

WILLIAMS, J. The appellant railway . company was required by the Corporation Commission to stop its two fast, through trains

Nos. 21 and 22, known as "The Flyer," at Norfolk, a station on its line between Oklahoma City and Parsons, Kan. The Atchison, Topeka & Santa Fe Railroad Company also has a line at said station paralleling appellant's line a considerable distance. Certain passenger trains over the latter line, one going north in the morning about 5:45 and south in the evening at about 9:35, and also a local freight daily, both ways, except Sunday, carrying passengers, stop at said station. The schedule for trains which stop at Norfolk on appellant's line is as follows: North-bound: No. 26, 1:20 p. m. for points between Oklahoma City and Parsons, Kan., with standard sleeper and chair car attached; No. 562, local freight carrying passengers daily except Sunday, between 12:10 p. m. and 1:10 p. m. South-bound: No. 25, 2:25 p. m. for points between Parsons, Kan., and Oklahoma City, with standard sleeper and chair car attached; No. 561, local freight, carrying passengers daily except Sunday, 9:55 a. m. These trains stop at all stations. Norfolk is a prepaid freight station having shipping pens, a cotton gin, two section houses, and a school-house, but no stores or residences. Trains numbered 21 and 22 are designed by appellant to meet the demands for interstate business by making connections at Parsons, Kan., for Kansas City, and St. Louis points, demanding rapid transit.

The questions raised on this record are whether or not the order complained of (1) is just and reasonable, or (2) interferes with interstate commerce. The matter of validity of the order of the Commission requiring railroad companies to stop certain of their trains at stations named, has been a matter of much adjudication. A statute of Illinois, requiring the Illinois Central Railroad to delay its fast-mail train from Chicago to New Orleans by turning aside from the direct route and running over a branch line to the station of Cario, 3½ miles away from a point on the main and direct line, and back again to the same point, because said station is the county seat, was held to be unconstitutional if the company had made adequate accommodations by other trains for interstate passengers to and from Cairo. *Ill. Cent. R. Co. v. Illinois,* 163 U. S. 142, 16 Sup. Ct. 1096, 41 L. Ed. 107.

"A railroad corporation created by a state is for all purposes of local government a domestic corporation, and its railroad within the state is a matter of domestic concern. Even when its road connects as most railroads do with railroads in other states, the state which created the corporation may make all needful regulations of a police character for the government of the company while operating its road in that jurisdiction. It may prescribe the location and the plan of construction of the road, the rate of speed at which the trains shall run, and the places at which they shall stop, and may make any other reasonable regulations for their management, in order to secure the objects of the incorporation, and the safety, good order, convenience, and comfort of the passengers and of the public. All such regulations are strictly within the police power of the state. They are not in themselves regulations of interstate commerce; and it is only when they operate as such in the circumstances of their application, and conflict with the express or presumed will of Congress exerted upon the same subject, that they can be required to give way to the paramount authority of the Constitution of the United States. *Stone v. Farmers' Loan & T. Co.,* 116 U. S. 307, 333, 334 [6 Sup. Ct. 334, 388 1191] (29 L. Ed. 636, 645); *Smith v. Alabama,* 124 U. S. 465, 481, 482, [8 Sup. Ct. 564] (31 L. Ed. 508, 513, 1 Interst. Com. R. 804); *Hennington v. Georgia,* 163 U. S. 299, 308, 317 [16 Sup. Ct. 1086] (41 L. Ed. 166, 170, 173); *New York, N. H. & H. R. Co. v. New York,* 165 U. S. 628, 632 [17 Sup. Ct. 418] (41 L. Ed. 853, 854). In Minnesota, as in other states, the county seat of each county is the place appointed for holding the meetings of the county commissioners and the sessions of the district court, and for keeping the offices of the clerk of that court, the judge of probate, the county auditor, the county treasurer, the sheriff, and the register of deeds. * * * The Legislature of the state may well treat it as one important object of establishing a railroad within the state that public officers, parties to actions, jurors, witnesses, and citizens generally should be enabled the more promptly to reach and leave the centers to which their duties or business may call them. To require every regular passenger train, running wholly within the limits of the state, to stop at all stations at county seats directly in its course, for the few minutes and at the trifling expense, needed to take on and discharge passengers with safety, is a reasonable exercise of the police power of the state, and cannot be considered a taking of property of the company

without due process of law, nor an unconstitutional interference with interstate commerce, or with the transportation of the mails of the United States." (*Gladson v. Minnesota,* 166 U. S. 427, 17 Sup. Ct. 627, 41 L. Ed. 1064.)

In distinguishing the foregoing case from the Illinois Case the court said:

"* * * The statute of the state of Illinois, as construed and applied by the Supreme Court of the state, required a fast train, carrying interstate passengers and the United States mail from Chicago in the state of Illinois to places in other states south of the Ohio river, over an interstate highway established by authority of Congress, to delay the transportation of such passengers and mails by turning aside from the direct interstate route, and running to a station 3 1-2 miles away from a point on that route, and back again to the same point, and thus traveling 7 miles which formed no part of its course, before proceeding on its way; and, as the court observed, the question whether a statute which merely required interstate railroad trains, without going out of their course, to stop at county seats would be within the constitutional power of the state was not presented, and could not be decided, upon the record in that case. * * * But in the case at bar the train in question ran wholly within the state of Minnesota, and could have stopped at the county seat of Pine county without deviating from its course; and the statute of Minnesota expressly provides that: 'This act shall not apply to through railroad trains entering this state from any other state, or to transcontinental trains of any railroad.'"

In the case of *Lake Shore & M. S. Ry. Co. v. Ohio ex rel. Lawrence,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702, the Legislature of that state required each railroad company whose road was operated in the state to cause three of its regular trains carrying passengers, each way, if so many are run daily, Sundays excepted, to stop at a station, city, or village containing over 3,000 inhabitants sufficient time to receive and let off passengers, for the public convenience, and not a regulation of interstate commerce. In that case, the court said:

"The plaintiff in error accepted its charter subject necessarily to the condition that it would conform to such reasonable regulations as the state might from time to time establish, that were not in violation of the supreme law of the land. In the absence

of legislation by Congress it would be going very far to hold that such an enactment as the one before us was in itself a regulation of interstate commerce. It was for the state to take into consideration all the circumstances affecting passenger travel within its limits, and, as far as practicable, make such regulations as were just to all who might pass over the road in question. It was entitled, of course, to provide for the convenience of persons desiring to travel from one point to another in the state on domestic trains. But it was not bound to ignore the convenience of those who desired to travel from places in the state to places beyond its limits, or the convenience of those outside of the state who wished to come into it. Its statute is in aid of interstate commerce of that character. It was not compelled to look only to the convenience of those who desired to pass through the state without stopping. Any other view of the relations between the state and the corporation created by it would mean that the directors of the corporation could manage its affairs solely with reference to the interests of stockholders, and without taking into consideration the interests of the general public. It would mean, not only that such directors were the exclusive judges of the manner in which the corporation should discharge the duties imposed upon it in the interest of the public, but that the corporation could so regulate the running of its interstate trains as to build up cities and towns at the ends of its line or at favored points, and by that means destroy or retard the growth and prosperity of those at intervening points. It would mean also that, beyond the power of the state to prevent it, the defendant railway company could run all its trains through the state without stopping at any city within its limits, however numerous its population, and could prevent the people along its road within the state who desired to go beyond it limits from using its interstate trains at all, or only at such points as the company chose to designate. A principle that in its application admits of such results cannot be sanctioned. We perceive in the legislation of Ohio no basis for the contention that the state has invaded the domain of national authority, or impaired any right secured by the national Constitution. In the recent case of *Jones v. Brim,* 165 U. S. 180, 182 [17 Sup. Ct. 282] (41 L. Ed. 677, 678), it was adjudged that, embraced within the police powers of a state was the establishment, maintenance, and control of public highways, and that under such powers reasonable regulations incident to the right to establish and

maintain such highways could be established by the state. And the state of Ohio by the statute in question has done nothing more than to so regulate the use of a public highway established and maintained under its authority as will reasonably promote the public convenience. It has not unreasonably obstructed the freedom of commerce among the states. Its regulations apply equally to domestic and interstate railroads. Its statute is not directed against interstate commerce, but only incidentally affects it. It has only forbidden one of its own corporations from discriminating unjustly against a large part of the public, for whose convenience that corporation was created and invested with authority to maintain a public highway within the limits of the state."

In the case of *C., C. & St. L. Ry. Co. v. Illinois*, 177 U. S. 514, 20 Sup. Ct. 722, 44 L. Ed. 868, it was held that an act of the Legislature requiring all regular passenger trains to stop at county seats constitutes a direct burden upon interstate commerce in violation of the United States Constitution, so far, at least, as that statute requires through interstate passenger trains to stop at such stations when adequate train service has been provided for local traffic. In this case the court said:

" * * * A state statute, requiring every railroad to stop all its regular passenger trains running wholly within the state at its stations in all county seats long enough to take on and discharge passengers with safety, was held to be a reasonable exercise of the police power of the state, even as applied to a train connecting with a train of the same company running into another state, and carrying some interstate passengers as well as the mail. The case was distinguished from that of the *Illinois Cent. R. Co. v. Illinois,* [163 U. S. 942, 16 Sup. Ct. 1096, 41 L. Ed. 107] in the fact that the train in question ran wholly within the state of Minnesota, and could have stopped at the county seat without deviating from its course, and that the statute of Minnesota expressly provided that the act should not apply to through trains entering the state from any other state, or to transcontinental trains of any railroad. Speaking of police regulation for the government of railroads while operating roads within the jurisdiction of the state, it was said that: 'They are not in themselves regulations of interstate commerce; and it is only when they operate as such in the circumstances of their application, and conflict with the expressed or presumed will of Congress exerted upon the same subject, that they can be re-

quired to give way to the paramount authority of the Contitution of the United States.' The railroad in this case was treated as a purely domestic corporation, notwithstanding it connected, as most railroads do, with railroads in other states. In the most recent case upon this subject (*Lake Shore & M. S. R. Co. v. Ohio*, 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702), a statute of Ohio, providing that every railroad company should cause three of its regular trains carrying passengers, if so many are run daily, Sundays excepted, to stop at a station, city or village containing over 3,000 inhabitants, for a time sufficient to receive and let off passengers, was held to be, in the absence of legislation by Congress upon the subject, consistent with the Constitution of the United States, when applied to trains engaged in interstate commerce through the state of Ohio. In delivering the opinion of the court Mr. Justice Harlan observed: 'The statute does not stand in the way of the railroad company running as many trains as it may choose between Chicago and Buffalo without stopping at intermediate points, or only at very large cities on the route, if in the contingency named in the statute the required number of trains stop at each place containing 3,000 inhabitants long enough to receive and let off passengers. It seems from the evidence that the average time required to stop a train and receive and let off passengers is only three minutes. Certainly the state of Ohio did not endow the plaintiff in error with the rights of a corporation for the purpose simply of subserving the convenience of passengers traveling through the state between points outside of its territory. * * * It was for the state to take into consideration all the circumstances affecting passenger travel within its limits, and as far as practicable make such regulations as were just to all who might pass over the road in question. It was entitled, of course, to provide for the convenience of those who desired to travel from places in the state to places beyond its limits, or the convenience of those outside of the state who wished to come into it. Its statute is in aid of interstate commerce of that character. It was not compelled to look only to the convenience of those who wished to pass through the state without stopping.' This case is readily distinguishable from the one under consideration, in the fact that the statute of Ohio required only that three regular passenger trains should stop at every station containing 3,000 inhabitants, leaving the company at liberty to run as many through passenger trains exceeding three per day as it chose, without restriction as

to stoppage at particular stations. In other words, it left open the loophole which the statute of Illinois has effectually closed."

The court further said:

"It is evident that the power attempted to be exercised under this statute would operate as a serious restriction upon the speed of trains engaged in interstate traffic, and might, in some cases, render it impossible for trunk lines running through the state of Illinois to compete with other lines running through states in which no such restrictions were applied. If such passenger trains may be compelled to stop at county seats, it is difficult to see why the Legislature may not compel them to stop at every station—a requirement which would be practically destructive of through travel, where there were competing lines unhampered by such regulations. While, as we held in the Lake Shore Case, railways are bound to provide primarily and adequately for the accommodation of those to whom they are directly tributary, and who not only have granted to them their franchise, but who may have contributed largely to the construction of the road, they are bound to do no more than this, and may then provide special facilities for the accommodation of through traffic. We are not obliged to shut our eyes to the fact that competition among railways for through passenger traffic has become very spirited, and we think they have a right to demand that they shall not be unnecessarily hampered in their efforts to obtain a share of such traffic. It is evident, however, that neither the greater safety of their tracks, the superior comfort of their coaches or sleeping berths, nor the excellence of their tables would insure them such share if they were unable to compete with their rivals in the matter of time. The great efforts of modern engineering have been directed to combining safety with the greatest possible speed in transportation, both by land and water. The public demand this; the railway and steamship companies are anxious in their own interests to furnish it, and local legislation ought not to stand in the way of it. With no disposition whatever to vary or qualify the cases above cited, neither the conclusions of the court nor the tenor of the opinions, are opposed to the principle we hold to in this case that, after all local conditions have been adequately met, railways have the legal right to adopt special provisions for through traffic, and legislative interference therewith is unreasonable, and an infringement upon that provision of the Constitution which we have held requires that commerce between the states shall be free and unobstructed."

In the case of *Mississippi R. R. Commission v. Illinois C. R. Co.*, 203 U. S. 335, 27 Sup. Ct. 90, 51 L. Ed. 209, the court said:

"The order cannot be viewed along in the light of ordering a stop at one place only, which might require not more than three minutes, as asserted. It is the question whether these trains can be stopped at all at any particular station when proper and adequate facilities are otherwise afforded such station. If the commission can order such a train to be stopped at a particular locality under such circumstances, then it could do so as to other localities, and in that way the usefulness of a through train would be ruined, and the train turned from a through to a local one in Mississippi. The Legislature of a state could not itself make such an order, and it cannot delegate the power to a commission to do so, in its discretion, when adequate facilities are otherwise furnished. The transportation of passengers on interstate trains as rapidly as can with safety be done is the inexorable demand of the public who use such trains. Competition between great trunk lines is fierce and at times bitter. Each line must do its best even to obtain its fair share of the transportation between states, both of passengers and freight. A wholly unnecessary, even though a small, obstacle ought not, in fairness, to be placed in the way of an interstate road, which may thus be unable to meet the competition of its rivals. We by no means intend to impair the strength of the previous decisions of this court on the subject, nor to assume that the interstate transportation, either of passengers or freight, is to be regarded as overshadowing the rights of residents of the state through which the railroad passes to adequate railroad facilities. Both claims are to be considered, and after the wants of the residents within a state or locality through which the road passes have been adequately supplied, regard being had to all the facts bearing upon the subject, they ought not to be permitted to demand more, at the cost of the ability of the road to successfully compete with its rival in the transportation of interstate passengers and freight."

In the case of *Atlantic Coast Line R. Co. v. Wharton*, 207 U. S. 328, 28 Sup. Ct. 121, 52 L. Ed. 230, the court said:

"That any exercise of state authority, in whatever form manifested, which directly regulates interstate commerce, is repugnant to the commerce clause of the Constitution is obvious.

It hence arises that command of a state, whether made directly or through the instrumentality of a railroad commission, which orders, or the necessary effect of which is to order, the stopping of an interstate train at a named station or stations, if it directly regulates interstate commerce, is void. It has been decided, however, that some orders which may cause the stoppage of interstate trains made by state authority may be valid if they do not directly regulate such commerce. *Lake Shore & M. S. R. Co. v. Ohio,* 173 U. S. 285, 19 Sup. Ct. 465, 43 L. Ed. 702. When, therefore an order made under state authority to stop an interstate train is assailed because of its repugnancy to the interstate commerce clause, the question whether such order is void as a direct regulation of such commerce may be tested by considering the nature of the order, the character of the interstate commerce train to which it applies, and its necessary and direct effect upon the operation of such train. But the effect of the order as a direct regulation of interstate commerce may also be tested by considering the adequacy of the local facilities existing at the stations at which the interstate commerce train has been commanded to stop. True, inherently considered, whether there be adequate local facilities is not a federal question, but in so far as the existence of such adequate local facilities is involved in the determination of the federal question of whether the order concerning an interstate train does or does not directly regulate interstate commerce, that question for such purpose is open, and may be considered by us. * * * Without stopping to consider whether, in view of the character of the trains to which the order before us related, it would not result that the order complained of was a direct regulation of interstate commerce, and testing the subject by the local facilities at the station at which the trains were ordered to stop, we think the railroad company in this case has furnished such reasonable accommodations to the people at Latta as it can be fairly and properly called upon to give, and the order to stop these trains is therefore not a valid one. The term 'adequate or reasonable facilities' is not in its nature capable of exact definition. It is a relative expression, and has to be considered as calling for such facilities as might be fairly demanded; regard being had, among other things, to the size of the place, the extent of the demand for transportation, the cost of furnishing the additional accommodations asked for, and to all other facts which would have a bearing upon the question of convenience and cost."

The court further said:

"Of course, it is not reasonable to suppose that the same facilities can be given to places of very small population that are supplied to their neighbors who live in much larger communities, and the defendants in error, it may be conceded, make no such demand. No one would assert that one daily train each way between New York and Philadelphia would furnish adequate facilities for the transportation of passengers. Twenty times that number of trains would be necessary, and yet one through train a day, each way, through so small a place as Latta to New York or Tampa would, in all probability, easily transport all the passengers desiring transportation between these places. Nevertheless, the fair needs of the locality for transportation, to other local points, must be considered and provided for. This, as we think, has been done."

The Atchison, Topeka & Santa Fe southbound train makes connection at Cushing with a train of the same road for Stillwater, the county seat; likewise, the south-bound trains on appellant's line run into Cushing. The north-bound train on the Atchison, Topeka & Santa Fe line connects at Esau Junction with a line of the same system for Stillwater, the county seat. Appellant's line diverges from the Atchison, Topeka & Santa Fe line north of Yale, intersecting with the St. Louis & San Francisco line between Tulsa and Enid at Hallet, and connecting with a line of its system at Osage for Tulsa and Muskogee. It is not necessary in order to dispose of this appeal to determine whether or not the stopping of the trains complained of would result in the regulation of interstate commerce, for we think the railroad company in this case has furnished such reasonable accommodation to the people at Norfolk as they can be reasonably called upon to give, the size of the place, the extent of the demand for transportation, etc., considered, and the order to stop these trains cannot be sustained. It seems that the purpose in requesting this order was that persons residing adjacent to this station might have the opportunity of visiting points like Oklahoma City, Bartlesville, and Parsons, Kan., and return the same day, thereby having the advantage of day-time travel. This identical question was before

the Supreme Court of Arkansas. In the case of *St. Louis, I. M. & S. R. Co. v. State,* 85 Ark. 284, 107 S. W. 989, the court said:

"The principal reason urged as to the inadequacy of the facilities provided by the railroad company is that the only through train to St. Louis which stops at Arkadelphia reaches stations in this state north of Little Rock at an unreasonable hour in the night time for passengers to debark, and that a through north-bound train should be provided which will land passengers from Arkadelphia at those stations at a more reasonable hour. It is also earnestly urged that, as Arkadelphia is the county seat of Clark county, and as circuit court, when in session, usually convenes at 8:30 o'clock a. m., this train by which litigants and witnesses living south of that place could reach there at 6:18 a. m. ought to be required to stop there for their convenience, instead of requiring them to wait for train No. 24, due to reach Arkadelphia at 9:26 a. m. Now, it will be admitted that there is, at best, some inconvenience which must attend the traveler. A perfect system of railroad transportation, whereby the traveler can begin his journey at an hour which precisely suits his own convenience, progress with due speed and arrive at his destination, wherever that may be, at a reasonable hour of the day, is scarcely to be expected, however much it is to be desired. That would be Utopian. A train schedule could not be arranged so as to begin and end every journey in the daytime. What the state may demand of a railroad company for the benefit of the people is reasonable service, * * * facilities which are as near perfect as may reasonably be furnished, considering all the circumstances."

In the case of *Minneapolis, St. P. & S. Ste. M. Ry. Co. v. Railroad Commission,* 136 Wis. 146, 116 N. W. 905, 17 L. R. A. (N. S.) 821, the court said:

"In determining whether or not the order of the Commission is unreasonable, it must also be considered that every unnecessary burden imposed upon the railroad impairs its net receipts, and diminishes that margin, if there be one, between the amount sufficient to assure a fair return on the value of its property, plus the amount of its fixed charges and operating expenses and its gross receipts. In this margin the public and the railroads are interested, because it is only when this exists that betterments in construction or improvements in service not imperative, or indispensible, or reduction in rates, will ordinarily be voluntarily made

by the railroad, or can ordinarily be ordered or enforced by the Commission. We are not now speaking of those extreme cases where the public duty must be discharged, whatever the financial consequences to the railroad. *Covington v. Sandford,* 164 U. S. 578, 17 Sup. Ct. 198, 41 L. Ed. 560, and cases in Rose's Notes; 3 Cook Corp. (4th Ed.) §§ 900, 901, and cases in notes. But in ordinary cases to waste this margin is to waste a fund in which the whole public is interested. This should never be done for the benefit of the few, as against the interests of many. It is also to be considered that this margin ought not ordinarily to be exhausted or swept away by orders or requirements of the Railroad Commission as fast as accumulated, because human nature or railroad nature is such that no one will long economize on operating or other expenses if his economy only furnishes a larger basis for further exactions. The rights of the public and the right of the railroad under this new law must be ascertained and developed by the Railroad Commission slowly and laboriously, moving from precedent to precedent as new instances arise, after the manner of common law courts. As was said in *Bates v. Relyea et al.* 23 Wend. (N. Y.) 336, 341: 'They (these instances) must from the nature of our legal system be the same to the science of law as a convincing series of experiments is to any other branch of inductive philosophy.' Patience on the part of the public and on the part of the carrier, and time, will be necessary. The notion that commissions of this kind should be closely restricted by the courts, and that justice in our day can be had only in courts is not conducive to the best results. Justice dwells with us as with the fathers, it is not exclusively the attributes of any office or class, it responds more readily to confidence than criticism, and there is no reason why the members of the great Railroad Commission of this state should not develop and establish a system of rules and precedents as wise and beneficent within their sphere of action as those established by the early common-law judges. We find the statute well framed to bring this about."

In the case of *Deaver et al. v. Wyandotte and St. Louis & S. F. R. Co.,* decided by the Corporation Commission on November 20, 1908, the following order was entered, to wit:

"The complaint in this case was filed by the citizens of Wyandotte, asking that the Commission require the defendant to stop its east-bound train No. 408 at that station for the purpose of performing the usual passenger service, that better con-

nections may be made with the company's north-bound train at Afton. The defendant, answering, alleges that this train is known as one of the fast interstate mail trains, and there would be no special reason for stopping at this station without stopping at other stations of similar size and conditions, and that it would greatly interfere and make it impossible for this train to make its regular time in competition with other fast trains, and that an extra local passenger train was now being operated over this road for the purpose of performing the local passenger service, making two trains a day, each way, stopping at the town of Wyandotte. The evidence in this case shows that train No. 408 is the east-bound interstate fast mail train operated by the defendant; that the town of Wyandotte has about 400 inhabitants; that its passenger service now consists of two trains each way daily. When towns or communities have a reasonable or the average passenger service that is performed at all similar stations in the state of Oklahoma, as is now enjoyed by Wyandotte, the Commission is not disposed to interfere with the schedule of fast mail trains performing interstate service, by requiring them to stop at all local stations. If this privilege was extended to one town, other towns similarly situated would have the right to demand the same service, and it appears to the Commission that the stopping of fast trains at stations should be left largely to the regulation of the railroad managers when ample and reasonable service by other trains is afforded the communities and towns through which such trains run. It is therefore ordered that the complaint be dismissed without prejudice."

See also *Schmidt v. Great Northern Railway Co.* (decided by the Railroad Commission of Wisconsin Sept. 3, 1909) 4 Wis. R. C. Reports 121, wherein the Commission in passing upon a similar case, said:

"However much this Commission would like to assist the citizens of the territory tributary to Foxboro to have more convenient service in and out of that station, it is powerless to grant the relief asked for."

It is not shown that any considerable number of persons residing at Norfolk embark on appellant's trains at this station for Oklahoma City, Bartlesville, and Parsons points. If the appellant is required by the order of the Commission to convert trains numbered 21 and 22 into local trains, that would ne-

cessitate an additional through passenger train each way to meet the demands of the interstate traffic.   This would occasion additional expense in the way of equipment, employees, maintenance, etc.   Passenger fares on the basis of a two-cent rate should not be jeopardized by unreasonable burdens in the way of unreasonable expense or hampering the operation of the trains in this state.   Common carriers should be required to furnish every reasonable facility and convenience for the public, but when the policy has been declared that such service shall be supplied for lowest possible rate and that such rate is being put on trial, due care should be exercised that the same be not needlessly endangered.

The order of the Corporation Commission relating to the stoppage of the trains is reversed, and the part pertaining to the establishment and construction of a depot at said place is affirmed; there being no assignment of error in the record covering that point.

All the Justices concur.