# E. S. WARNER, Respondent, v. ST. LOUIS & SAN FRANCISCO RAILROAD COMPANY, Appellant.

### Springfield Court of Appeals, May 8, 1911.

1. CARRIERS: Live Stock: Delay in Shipment: Train Schedules: Reasonableness. Plaintiff sued to recover damages from a railroad company because of the failure of the company to move a shipment of sheep within a reasonable time after they had been delivered to the company's stock yards ready for shipment; plaintiff's main contention being that according to the company's schedule, the stock train which handled the local shipments from this point, passed the station at 6:47 a. m., an hour which plaintiff claimed was unreasonable and made it impossible for him to drive his sheep ten or twelve miles to the station and load the same in time for this train. The schedules and rules governing stock shipments over the entire system of defendant, together with the other evidence, is examined and *held* to show that the schedule at the station from which plaintiff's stock was shipped was not unreasonable and plaintiff was denied a recovery.

2. ———: ———: Discriminations: Stopping Trains: Regulation by Court. Neither section 3107 nor 3121 of the Revised Statutes 1909, which govern railroad companies in the shipment of stock, require the carrier to stop all of its trains at any particular station to receive live stock, nor do these sections expressly authorize the courts to make such an order.

3. ———: Railroad Commissioners: Fixing Train Schedules. The Legislature has not clothed the railroad commissioners with the authority to fix the schedules of railroad companies governing the running of its freight trains.

4. CARRIERS: Common Law: Discrimination: Regulation by Court. Without any statutes the carrier at common law is prohibited from establishing unreasonable rules and regulations governing the manner of receiving and handling freight offered for shipment, and it is generally recognized that the courts have the inherent power, in the absence of statutory authority, to prohibit railroads from unfairly treating their patrons.

5. ———: Statute: Regulation. Under the statutes enacted in this state for the purpose of regulating railroads, it appears not to have been the intention of the law makers to take control of railroad property and the business from the owners, but merely to supervise the same to prevent extortion and injustice and to secure reasonable and adequate service.

6. ———: **Rates: Service: Reasonableness: Regulation by Court.** So long as the rates charged by a carrier are not unreasonable nor discriminating, and the service is adequate, the courts will not interfere.

7. ———: **Rules: Reasonableness.** In determining what is a reasonable rule or regulation of a carrier in handling its business, the inquiry must not stop at one station or one community, but it must extend to and contemplate as a whole the entire system.

8. **EVIDENCE: Judicial Notice: Daylight.** The court will take notice that during the warm weather it gets light enough to drive stock about 4:00 a. m. and that a shipper, who has only four or five miles to .drive, could in all probability get his stock to the station in plenty of time for the train leaving the station at 6:47 a. m.

9. **CARRIERS: Live Stock: Rules: Through Freight Trains: Stopping for Local Business.** Where it was the rule of a railroad company throughout its entire system, that at each division point a train was started in the morning, which picked up local freight and live stock and carried it to the next division point, where the live stock was consolidated into a fast stock train and run through to the market without stopping to deliver or receive other freight, a shipper cannot complain because his stock was not picked up by one of these through trains, although two of them passed his station while his stock was ready for shipment and several hours before the schedule for the local freight train.

10. ———: **Freight: Through Freight Trains: Stopping for Local Business.** A railroad company has the right to run its through trains without stopping for local business, if it has provided adequate train or trains for the local work.

11. ———: **Schedules: Reasonableness: Evidence.** Mere proof that if plaintiff's shipment of stock had been delivered to the market in the morning, the animals would have filled up on water, presenting a plump appearance and be materially increased in weight, whereas, under defendant's- schedule the shipment arrived at night and plaintiff was deprived of this feature of the market, is not in itself sufficient to prove that defendant's schedule for its stock trains was unreasonable.

12. ———: ———: **Delivering Stock Many Hours Before Shipment.** Where a carrier's schedules for its stock trains are reasonable and are known to the shipper, the shipper is not entitled to damages, because he delivered his stock nearly twenty-four hours before it could be shipped under the schedule.

Appeal from Webster Circuit Court.—*Hon. C. H. Skinker*, Judge.

REVERSED.

*W. F. Evans, Fred H. Wood* and *Mann, Johnson & Todd* for appellant.

(1) The court should have given defendant's peremptory instruction to the jury to find the issues on its behalf. Because, even if it be conceded for the sake of the argument that there was a delay on defendant's part in the transportation and delivery of plaintiff's stock from Conway to National Stock Yards, Illinois, after plaintiff put said stock in defendant's yards at Conway, August 15, 1910, yet there is no evidence in the record to show such delay on the part of the defendant was negligent. Mere proof of delay without more does not establish the charge if negligence. Decker v. Railway, 131 S. W. (Mo.) 118; Clark v. Railroad, 138 Mo. App. 424; Ecton v. Railroad, 125 Mo. App. 223; McCrary v. Railroad, 109 Mo. App. 567; Wright v. Railroad, 118 Mo. App. 392; Haase Fish Co. v. Trans. Co., 143 Mo. App. 57. (2) The only question in this case is as to the reasonableness of defendant's schedule and rules governing the transportation of livestock, under which a pick up train is provided on each division and through stock trains are forbidden to stop to pick up local stock. The reasonableness of such rules is a question of law and the court erred in submitting the case to the jury. Chilton v. Railroad, 114 Mo. 88; Railroad v. Whitemore, 43 Ill. 420; 2 Elliott on Railroads, sec. 202; 3 Hutchison on Carriers, sec. 1077; Railroad v. Fleming, 14 Lea 128; Yorton v. Railroad, 54 Wis. 234; Railroad v. Rhoads, 25 Fla. 40; Vedder v. Fellows, 20 N. Y. 126; Railroad v. Hardy, 55 Ark. 134; Railway v. Motes, 117 Ga. 923; Gregory v. Railway, 100 Iowa, 345; Railroad v. Colby, 60 Neb. 572; Railroad v. Lyon, 123 Penn. St. 140; Ran

dall v. Railroad, 106 N. C. 612; Railroad v. Nuzum, 50
Ind. 141. Under the undisputed facts the court cannot
say as a matter of law that defendant's schedule and
rules are unreasonable. A railroad company has the
right to distinguish between through and local trains
and to decline to handle local business on the former.
Logan v. Railroad, 77 Mo. 663; Commission v. Rail-
road, 203 U. S. 335; Railroad v. Randolph, 53 Ill. 510;
Kyle v. Railway, 182 Fed. 613; Dietrich v. Railroad, 71
Pa. St. 432; Railroad v. Lightcap, 7 Ind. App. 249;
Railroad v. Ludlam, 57 Fed. 481; Connel v. Railroad
(Miss.) 7 Southern, 344; Browne v. Railroad, 12 S. E.
(N. C.) 958; Railroad v. Bell, 87 S. W. 730; Hancock
v. Railroad, 85 S. W. (Ky.) 210; Battle v. Railway
(Ga.) 48 S. E. 337; Usher v. Railroad, 80 Pac. (Kas.)
956. (3) Plaintiff was not entitled to suit his own
particular convenience to have his stock handled other-
wise than in accordance with the general rules pro-
vided for the handling of live stock, nor was the
defendant required to stop its regular through trains or
delay them to pick up his stock. Hibbard v. Railroad,
15 N. Y. 455; Railroad v. Kendrick, 40 Miss. 374; Rail-
way v. Turner, 94 S. W. 214. (4) Every presumption
of reasonableness attaches to the rules and schedule as
made and they should not be disturbed by the court in
the absence of the clearest testimony, which is wanting,
and in establishing such rules the duty of the railroad
company does not go beyond providing for the business
ordinarily done, and there is no evidence in this case that
trains provided were not adequate to take care of the
business. Ballentine v. Railroad, 40 Mo. 491; 2 Elliott on
Railroads, sec. 1576; Commission v. Railroad, 209 U. S.
108. (5) The failure of the plaintiff to have his live
stock on hand ready for shipment on August 15, the day
he desired to ship, and the hour when in the usual course
of defendant's business such shipments as plaintiff's
were taken up by defendant at Conway, was the negli-
gence and fault of plaintiff, and no negligence or fault

of defendant.    Fowler v. Steam Co., 87 N. Y., 190; Hutchinson on Carriers (New Ed.), sec. 628, 511, 512.

L. C. *Mayfield* and *Hamlin & Seawell* for respondent.

(1)    In the present case the question is just simply whether the delay from 11:00 a. m. Monday until the stock reached its destination at 12:00 p. m. Tuesday night was unreasonable without regard to any rule, regulation or schedule of the company, and whether or not it was reasonable was a question of fact for the jury. Vincill v. Railroad, 132 Mo. App. 722; Douglas v. Railroad, 53 Mo. App. 473; Sloop v. Railway, 93 Mo. App. 603; Ficklin v. Railroad, 117 Mo. App. 211; McCrary v. Railroad, 109 Mo. App. 567; Bushnell v. Railroad, 118 Mo. App. 635; Gilbert v. Railroad, 132 Mo. App. 697; Eads v. Railroad, 79 Mo. App. 511; Hamilton v. Railroad, 8 Mo. App. 597; Ball v. Railroad, 83 Mo. 574; Tucker v. Railroad, 50 Mo. 385; Chinn v. Railroad, 100 Mo. App. 576; 6 Cyc. 443, 428, 445, 524.    (2) The appellant is estopped to allege error in submitting to the jury the question as to the reasonableness of any schedule for it submitted to the jury that issue by its instructions numbered, 6, 7, 10. Gayle v. Foundry Co., 177 Mo. 427; Duffy v. Railroad, 19 Mo. App. 380.    (3) The case having been tried upon the theory that the reasonableness of the schedule and delay was for the jury, the appellant is in no position to complain of a theory adopted by it.    Bragg v. Railroad, 192 Mo. 331; Kellar v. Ins. Co., 198 Mo. 440.    (4)    All the instructions upon this issue were in harmony with the instructions given at the request of the appellant and it is in no position to allege error in that respect.    Lange v. Railroad, 208 Mo. 458; Smart v. City, 208 Mo. 162; Clippard v. Railroad, 22 Mo. 432.    (5)    As the court would have been compelled to declare this schedule unreasonable the submission of that question to the jury if ap-

pellant had not requested it, would have been a harmless error.   Railroad v. Iron Works, 117 Mo. App. 152.   (6) The respondent delivered his sheep to the appellant on the 15th of August at 11:00 o'clock, and they were received for shipment at that time by its agent at Conway.   The evidence discloses that the agent took charge of the sheep and placed cinders and sheaf oats in the pen and respondent says that he did not know that no train other than the six o'clock train would take his stock. This was a delivery to the appellant.   Lackland v. Railroad, 101 Mo. App. 420.

GRAY, J.—This is a suit instituted against the defendant, a railroad company, to recover damages which plaintiff alleges accrued to him on a shipment of lambs and sheep over the road of the defendant, from Conway, Mo., to the stockyards at East St. Louis, Ill., in August, 1910.

The facts are practically undisputed, and may be stated as follows: On the 13th day of August, 1910, the plaintiff notified the defendant's agent at Conway, that he would need, on August 15, double-deck cars sufficient to carry a shipment of 59 sheep and 177 lambs from Conway to said stockyards, and that he desired to ship said stock for the August 16th market.   At the time this request was made, the plaintiff knew the defendant only had one train a day upon which stock was shipped from Conway, and that that train was due at Conway at 6:47 a. m.   In fact, the demand for cars was made, and this suit was brought for the purpose of testing the reasonableness of the schedule that defendant had in force for operating its trains at the time the demand was made.

The stock was about ten or twelve miles from Conway and had to be driven to the station for loading. The weather was so warm that such stock had to be brought in during the forenoon, and accordingly plaintiff delivered his stock at the defendant's pens about

eleven a. m. on the morning of the 15th. The agent had the cars which were to carry plaintiff's sheep, locked, so that the sheep could not be loaded during the day. In the evening, however, the cars were unlocked and placed at plaintiff's disposal. The sheep were loaded and left for St. Louis on the morning of the 16th, the cars containing them having been attached to the regular 6:47 train. The stock reached the stock yards in East St. Louis that night, and was unloaded and sold the next day.

The plaintiff's evidence shows that leaving the stock in the defendant's pens at Conway during the afternoon of the 15th, and all night of the 16th, had a tendency to worry the animals and thereby caused a shrinkage or loss of flesh; that the stock when shipped on the morning train, arrived in St. Louis at night and was unloaded and at once went to the troughs to drink, but would not drink but little after that, and therefore, when viewed by the buyer after ten o'clock the next day, presented a shrunken and rough appearance, and a less price was obtained on account thereof.

During the night of the 15th, the evidence shows two freight trains passed through Conway. One of these trains carried thirty carloads of stock, and did not stop, and the other carried five carloads of stock with other freight, and stopped and set out a car that had become disabled. Conway was not a stopping place for either of these trains, and the one stopped only for the purpose of setting out a car that was dangerous to permit to longer remain in the train.

The plaintiff offered testimony tending to prove that prior to March 13, 1910, the company had maintained a schedule and provided a train for shippers at Conway, at about the hour of eleven o'clock a. m. that they could load their stock on that train and it arrived at the stockyards the next morning, was unloaded, went to the troughs to drink, filled up on water and presented a round and plump appearance to the buyer.

The above contains a fair statement of plaintiff's pleading and his evidence.

The defendant showed that its system consisted of 5000 miles of railroad, extending from St. Louis, Mo., through this state, into Arkansas, Oklahoma, Kansas, Texas and Mississippi; that the company maintained a single track railroad between St. Louis and Springfield; that at certain points along its railroad it had divisions where engines and train crews were changed and trains made up and dispatched; that it had adopted over its entire system, a rule that required a local pick-up train to start from a division point in the morning, and do local work and gather cars of stock and carry them to the first division point where all stock thus picked up was consolidated into a through fast stock train, and carried to market without stopping to pick up other cars or do further switching; that Conway was between Springfield and Newburg, the first division point east of Springfield; that in August, 1907, it maintained a local pick-up train between Springfield and Newburg; that this train left Springfield at 3:40 in the morning, and arrived at Conway at 6:47 a. m., and was adquate to carry all the freight between Springfield and Newburg, and that the stock so picked up by said local train was consolidated at Newburg into one of the said fast stock trains and carried to the stockyards.

The defendant's testimony further showed that all the stock carried over its system, except that received at division points, was carried one day on the local pick-up train and no longer; that plaintiff was treated the same as others, and was not discriminated against, but under the schedule adopted and in force, all shippers were treated exactly alike.

The evidence further shows that the fast stock train between Springfield and St. Louis, was known as No. 30, and it often consisted of as many as eight sections, owing to the number of cars of cattle to be transported; that much of this stock came from Oklahoma and other

southern points, and that defendant carried it from Springfield to St. Louis on its fast stock trains without stopping, in order to get the stock to market inside of the twenty-eight hour law enacted by Congress.

The defendant offered further testimony showing that its method of handling stock for the St. Louis market was the same as it handled shipments to Kansas City and other points. It was shown that stock coming from Thayer, the first division south of Springfield on the Memphis route, was carried to Springfield on the local pick-up train, and whether it was shipped to Kansas City or St. Louis, was carried from Springfield on a fast stock train; that the first division point west from Springfield on the Kansas City route, is Ft. Scott, Kansas; that all stock delivered for shipment between Springfield and Ft. Scott, was gathered up by local freight and carried to Ft. Scott, and there consolidated into a fast stock train and rushed through to Kansas City.

The defendant further showed that it had daily reports to its superintendent as to the amount of stock that would be offered for shipment, and that arrangements were made to have the engines and crews ready at division points, to carry the stock through on fast trains; that if its fast stock trains had to be stopped at Conway to receive plaintiff's stock, then it was likewise bound to stop them at all local points to receive stock, and that it could not do so and get the stock to market within a reasonable time.

The defendant claimed that its schedule in force prior to March 13th, was unsatisfactory; that the train left Springfield about eight o'clock in the morning, and there was so much to be done between Springfield and Newburg that the train crew was often unable to get the train to Newburg in time for its St. Louis connections, and on account thereof, the stock did not get to St. Louis in time for the following day's market; that in order to meet this difficulty, it started the train from Springfield

ahead of time, but even then it interfered with the trains west bound, so that the arrangement was unsatisfactory and the new schedule adopted.

The defendant's testimony further showed that it only had a single track between Springfield and St. Louis, and that it operated over that track from thirty to sixty trains a day; that some of these trains were fast mail trains and had the right of way, and for a failure to reach certain points in the Southwest within a specified time, penalties were inflicted by the government.

The cause was tried before a jury in Webster county, resulting in a judgment in favor of the plaintiff, from which the defendant appealed.

The question involved is the reasonableness of the schedule. All other questions were eliminated by the following instruction: "The court instructs the jury that you cannot find against the defendant for any alleged negligence of the defendant in running or operating its train after the same left Conway with plaintiff's stock."

Section 3107 of the Revised Statutes of 1909, reads: "Every such railroad corporation is hereby required to receive all freight or live stock which may be offered for transportation at the place of starting, at the junction of other roads, and at usual stopping places, and shall take, transport and deliver the same, without unnecessary delay, according to contract." And section 3121 reads: "Every railroad corporation chartered by or organized under the laws of this state, or doing business within the limits of the same, when desired by any person or corporation to ship live stock over its road in carload lots, shall receive and transport such live stock in carload lots within a reasonable time, without distinction, discrimination or favor between one shipper and another, and without distinction or discrimination as to the manner in which such live stock is offered to it for transportation." Neither of these sections require the carrier to stop all of its trains at any particular station to receive

live stock, and neither do they expressly authorize the court so to order.

While article 3, chapter 33 of the Revised Statutes of 1909 authorizes the railroad commissioners of this state to enforce the law as to rates to be charged, and also to require the companies to construct and mainain depots, and fully authorizes the commissioners to require the companies to stop their passenger trains at such stations, as, in the judgment of the commissioners may be necessary to provide the public with a reasonably convenient service in passenger transporation to and from such station, yet the legislature had not clothed the commissioners with the authority to fix the schedules of the company governing the running of its freight trains.

Without any statute, the carrier at common law is prohibited from establishing unreasonable rules and regulations governing the manner of receiving and handling commodities offered to it for shipment. [Harp v. Choctaw R. R. Co., 125 Fed. 445.] And the inherent power of the courts of this country in the absence of statutory authority to prohibit railroads from unfairly treating their patrons, is generally recognized. [Concord & M. R. Co. v. Boston & M. R. Co., 67 N. H. 464, 41 Atl. 263; People ex rel Hunt v. Railroad, 130 Ill. 175, 22 N. E. 857; State ex rel Mattoon v. Repubican Valley R. Co. 52 Am. Rep. 424.]

But the statutes of this state, enacted for the purpose of regulating railroads, show that it was not the intention of their framers to take control of railroad property and the business from the proprietors, but to supervise the same so as to prevent extortion and injustice, and to secure reasonably adequate service to every one without discrimination between individuals or localities. Our statutes and the court decisions contemplate that so long as the rates charged are not unreasonable, and so long as the service is fairly adequate, the owners of the railroad property shall not be interfered with as to such matters, and whenever complaint is made

that the rates are not reasonable, or the service not adequate, the issue is, are the rates established by the company unreasonable, or the service inadequate? And unless found so to be, the matters are left to the judgment of the owners of the property.

As said by the United States Supreme Court in Interstate Commerce Commission v. Railroad, 209 U. S. 108: "While from the public character of the work in which they are engaged, the public has the power to prescribe rules for securing faithful and efficient service and quality betwen shippers and communities, yet in no proper sense is the public a general manager."

When we concede the fact that the public service corporation, such as a railroad, is engaged in a legitimate business and has large sums invested therein, it should be permitted to transact its business in its own way, provided its rates and rules are reasonable and its service fairly adequate. And when the courts attempt to interfere in these matters, they should only do so upon a showing that the rates charged are unreasonable or the service inadequate. [Interstate Commerce Commission v. Railroad, supra.]

An attempt to operate a railroad system without strict rules and a complete and detailed train schedule could result in nothing but loss of life and property beyond estimate. [Logan v. Ry. Co., 77 Mo. l. c. 667.] The evidence shows that appellant has 5000 miles of road over which it operates its passenger and freight trains. It is the public highway over which a large per cent of the people of five states of the Union travel, and over which they are daily sending to market the results of their skill and toil. The work of preparing rules and a schedule for the operation of all trains over such a system, is not "child's play." It can only be successfully performed by some one thoroughly acquainted with the different sections of the country through which the system is operated. He must know the kinds of products produced in each section, the harvest time and the market therefor.

If he did not, he might adopt a set of rules and a schedule that would require the sidetracking of trains loaded with perishable fruits to give the right of way to ones loaded with railroad ties or cord wood. He must have in mind that the trains will be required to carry the government mail, and that a falure to carry the same with all proper dispatch will result in a penalty being inflicted. He must have in mind that the Federal government, out of consideration it has even for dumb animals, has declared by statute, that stock must not be kept on trains longer than a certain number of hours. He must arrange his schedule and the arrival and departure of his trains with reference to the connections to be made, and with the time made by his competitors. He must realize that the people will patronize the carrier that can give the best service, and his passenger trains must reach the centers of population in as good time as the trains of his competitors, or the latter will handle the business.

As said by the Supreme Court of the United States in Mississippi River Commission v. Illinois R. R. Co., 203 U. S. 335; "The transportation of passengers on interstate trains as rapidly as can with safety be done is the inexorable demand of the public who use such trains. Competition between great trunk lines is fierce and at times bitter. Each line must do its best even to obtain its fair share of the transportation between states, both of passengers and freight. A wholly unnecessary, even though a small obstacle ought not, in fairness, to be placed in the way of an interstate road, which may thus be unable to meet the competition of its rivals."

There are many other things to be considered, and to successfully perform the task, years of experience in the general railroad business and a complete knowledge of the particular system, are required. The courts and juries, as a general rule, are unequal to such a task. And while the railroad companies and all other public service corporations enjoying special privileges, have agreed with the state that in consideration of the right to

such special privileges, they will abide by reasonable regulations adopted for their dealings with the people, yet in determining what is a reasonble rule or regulation, the inquiry must not stop at one station or one community but must extend to the whole system and what is reasonable for all the people who are using the highways as means of transportation. [State v. Florida R. R. Co., 50 So. 445.]

To adopt a train schedule for operating passenger and freight trains over a great railroad system extending into and through a half dozen states, that would suit the convenience of everybody, would be as impossible as it would be to provide a schedule for the sunshine and shower. The rain that one farmer would demand for his corn, would ruin the other's hay.

Many states have special commissioners for this purpose. They are generally men who have special knowledge of the intricate business, and therefore, better qualified for the work than the average juror or court can possibly be. When such commissioners have investigated the matter and reached a conclusion and ordered a change in the running and operating of trains, then the courts will not disturb such finding and orders, unless a showing is clearly made. And the burden of showing that the commission erred is on the carrier. [Minneapolis & St. Paul R. R. Co. v. Railroad Commission, 116 N. W. 905, 17 L. R. A., N. S. 821.]

In this case no witness has testified that the schedule could be changed to the advantage of the shippers over the system. In fact the testimony on the part of plaintiff was limited to showing that so far as Conway and other immediate points are concerned, the train arrived at an inconvenient hour for shippers who had to drive their stock ten or twelve miles. The plaintiff's witnesses did not pretend to say how a change in the schedule such as they desired, would effect the other shippers on any one of the divisions in the 5000 miles of road. The plaintiff wanted a train at Conway at ten or eleven

o'colck a. m., and said eight o'clock would not do. The evidence shows the train provided for the shippers at Conway left Springfield at 3.40 a. m. and arrived at Conway at 6:47, or a few minutes over three hours after it left Springfield. To meet the plaintiff's desire and have the train at Conway at eleven o'clock in the morning, it would have to leave Springfield at eight and reach the first shipping point east of Springfield about 8:30. This schedule would not suit a shipper who had to drive ten or twelve miles to get his stock to such point, and yet it might be entirely satisfactory to one who only had six miles to drive. Thus it is apparent that a schedule that would suit one shipper might be entirely unsatisfactory to another at the same point.

On of the complaints against the present schedule, is that sheep cannot be driven in extremely warm weather in the middle or afternoon of the day, and neither can they be driven at night; that the plaintiff had to drive ten or twelve miles to reach the station at Conway, and therefore, could not make the drive in time to load for the regular morning train.

The courts will take notice that during the warm weather in this state, it gets light enough to drive stock about 4 a. m., and therefore, a shipper who only had four or five miles to drive, could in all probability get his stock to the station in plenty of time for this train. And even if the train passed Conway at an hour suitable to plaintiff, it might be too early for a man who had to drive fifteen miles.

Plaintiff further complains that the appellant should be required to stop its through trains and carry his stock to market on one of them; that it would only take fifteen or twenty minutes to do so, and that in the night of August 15th, two such trains passed Conway, and that one of them stopped at Conway and set out a car.

As heretofore stated, it was shown by appellant that a rule had been established and was in force throughout

the entire system, that at each division point a train was started in the morning that did local freight work and picked up all stock and carried it to the end of the divison where it was consolidated into a fast stock train and run through to the market without stopping to deliver or receive other freight. This train from Springfield to St. Louis was known as No. 30, and the evidence shows that it often required eight or ten trains to carry the stock between said points, but they were all run as sections of No. 30. In other words, all stock had one day on the local or "pick-up" train, as the witnesses called it, except stock loaded at division points.

The appellant's testimony showed that plaintiff was treated in this respect just the same as all other shippers; that his stock was carried to Newburg, the first division point east of Springfield, and there was placed in one of the sections of No. 30 and run to St. Louis as a through fast freight, and was ready for the market the next morning. The appellant claimed that in these other stock trains, was stock that had been on the car nearly the twenty-eight hours allowed by the Federal statute, and if it stopped such train to do local work, it would be delayed until the statutory period had expired; that if it stopped its fast freight for plaintiff's stock, it would have to do so for not only all other shippers at Conway, but upon its entire system, and thereby practically destroy its through freight business.

There is substantial merit in this contention. The evidence shows that when more than one car of stock is to be loaded at a station, the engine of the train that is going to take the stock often has to move the first car loaded out of the way and place another at the chute and wait until it is loaded. This causes delay, and if many such stops had to be made over a division, it might result in the train arriving too late for the following day's market, and then the company would be called upon to respond in damages to the shipper whose stock had been delayed on account of this local work. Under the rule

in force, no stock was carried on a local train for a greater distance than to the first division point, but all was picked up by a local train and carried to such point, and there rushed through to the market without further delay.

If such rule is unreasonable, it must be for some reason not disclosed by the evidence in this case.   And if it is claimed that it should be so held as a matter of law, then the authorities are to the contrary, as it is held by the highest court in this state and in the United States, that the railroad company has the right to run its through trains witout stopping for local business, if it has provided an adequate train or trains for the local work. [Logan v. Railroad, 77 Mo. 663; Herndon v. Chicago R. I. & P. R. Co., 218 U. S. 135, 30 Sup. Ct. Rep. 633; Cleveland C. & St. L. R. Co. v. Illinois, 177 U. S. 514, 20 Sup. Ct. 722.]   And such is the general rule.   [33 Cyc. 657; M. K. & T. R. Co. v. State, 107 Pac. 172, 29 L. R. A., N. S. 159; Hancock v. Railway, 85 S. W. 210; Kyle v. Railway, 182 Fed. 613; Bell v. Railway, 87 S. W. 730; T. & P. R. Co. v. Ludlan, 57 Fed. 481; Usher v. Railway, 80 Pa. 956.]

The plaintiff claimed that his stock should have been delivered at the stockyards in the morning and unloaded a short time before the market opened.   He offered testimony proving that stock that is carried to the stockyards and unloaded a short time before the market opens, will fill up on water and look round and plump, and present a better appearance to the buyers, and in addition thereto, the weight of the animal is materially increased, and likewise the amount of the check received by the shipper for the sale of his stock.

The evidence shows that the shippers have the water question in mind in delivering their stock, and that the buyers make no deduction in the weight of the animal on account of the water it has consumed.   It is therefore but just and right, that the plaintiff should have an equal chance with the others in this respect.   But proof

that plaintiff, under the schedule complained of, was deprived of that feature of the market, was not sufficient of itself, to prove that the schedule was unreasonable.

The plaintiff further claims that he is entitled to damages because his stock was kept at Conway nearly twenty hours before it was shipped. When we fail to find that the train schedule was unreasonable, this question is determined thereby. The plaintiff knew when he applied for cars to be furnished at eleven o'clock a. m. on the 15th of August, that the train would not arrive to carry his stock until the morning of the 16th.

After a careful consideration of the issues involved, we have reached the conclusion that under all the evidence, plaintiff was not entitled to recover, and that appellant's instruction in the nature of a demurrer to the evidence should have been given. There are other questions relating to the admissibility of evidence, and the action of the court in giving and refusing instructions, but what we have just said disposes of the case and renders a decision on such issues unnecessary.

The judgment of the trial court will be reversed. All concur.